**Patrick PEPE, Plaintiff,**

v.

**RIVAL COMPANY, a Corporation Defendant.**

**No. CIV. A. 98–5091 AJL.**

United States District Court, D. New Jersey.

Dec. 15, 1999.

350

Richard M. Cohen, Leib, Kraus, Grispin & Roth, Scotch Plains, NJ, for Plaintiff.

Cynthia M. Jacob, Collier, Jacob & Mills, Somerset, NJ, for Defendant.

**OPINION**

LECHNER, District Judge.

Plaintiff, Patrick Pepe ("Pepe") filed a complaint in the Superior Court of New Jersey, Law Division, Union County (the "Complaint"), against the defendant, the Rival Company ("Rival"), alleging age discrimination under the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A., 10:5–1, *et seq.*, breach of an express and/or an implied employment contract and breach of the covenants of good faith and fair dealing. Rival filed a notice of removal (the "Notice of Removal") pursuant to 28 U.S.C. § 1446(a); diversity

jurisdiction was asserted pursuant to 28 U.S.C. § 1332

Currently before the Court is a motion for summary judgment (the "Motion for Summary Judgment"), filed by Rival.[1] For the reasons set out below, the Motion for Summary Judgment is granted.

*Facts*

A. *Parties*

Pepe resides in New Jersey. *See* Complaint; Notice of Removal ¶ 3. Pepe was employed by Rival from 1989 to 1998. *See* Complaint, First Count ¶ 1; Plaintiff's Rule 56.1 Statement ¶¶ 1, 62. Pepe was initially employed as a district sales manager ("District Sales Manager") and was later promoted to senior district sales manager ("Senior District Sales Manager") in the Rival Kitchen Sales Organization (the "Kitchen Sales Organization").[2] *See* Complaint, First Count ¶ 1; Plaintiff's Rule 56.1 Statement ¶¶ 1, 62.

Rival is a Delaware corporation with its principal place of business in Missouri.

*See* Notice of Removal ¶ 4. Rival sells various product lines, including a line of kitchen appliances. *See* Moving Brief at 1. Rival sells its product lines to retail customers which include department stores, distributors and certain national stores such as Wall–Mart, K–Mart and Target. *See* Deposition of Mark Bittner ("Bittner Dep.") at 175.

B. *Background*

1. *Allegations*

Pepe contends Rival is liable under the NJLAD, because his termination was allegedly motivated by age. *See* Complaint, First Count ¶¶ 11, 13. Pepe also alleges Rival is liable for breach of either an express and/or implied employment contract based upon his membership in a so-called Secular Trust (the "Secular Trust"), a pension plan offered to select Rival employees, and/or an employment handbook Rival sent to him at the beginning of his employment. *See id.* at Second Count, ¶¶ 3, 4. Finally, Pepe alleges Rival breached cove-

---

**1.** In support of the Motion, Rival submitted:

1. Defendant's Rule 56.1 Statement of Material Facts as to which there is no Genuine Dispute (the "Defendant's Rule 56.1 Statement");
2. Defendant's Objections and Admissions to Plaintiff's Rule 56.1 Statement of Material Facts ("Objections and Admissions to Plaintiff's Rule 56.1 Statement");
3. Joint Glossary of Terms;
4. Brief of Defendant Rival Corporation in Support of Motion for Summary Judgment (the "Moving Brief");
5. Volume I Certification of Cynthia M. Jacob, Esq., in Support of Motion for Summary Judgment, attaching Exhibits: 1PEPE, 2PEPE, 3 PEPE, 1 BITTNER, 2 BITTNER, BIGGS, MANNING, YAGER, 1 WITTER, 2 WITTER, PRUNER, FRANCIS, ZEHNER;
6. Volume II Certification of Cynthia M. Jacob, Esq., in Support of Motion for Summary Judgment, attaching Exhibits A through F;
7. Supplemental Certification of Cynthia M. Jacob, Esq. in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, · attaching Exhibits A through D (the "Jacob Supplemental Cert.");

8. Certification of Shelia Butler (the "Butler Cert."); and
9. Defendant's Reply Brief in Further Support of Motion for Summary Judgment, (the "Reply Brief").

In opposition to the Motion, Pepe submitted:

1. Plaintiff's Rule 56.1 Statement of Material Facts (the "Plaintiff's Rule 56.1 Statement");
2. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (the "Opposition Brief");
3. Certification of Marc Opfell (the "Opfell Cert.");
4. Certification of Arthur Lehrhoff (the "Lehrhoff Cert.");
5. Certification of Patrick Pepe (the "Pepe Cert."); and
6. Certification of Richard M. Cohen, Esq., attaching Exhibits A through R.

**2.** The record demonstrates the only distinction between Pepe, as a Senior District Sales Manager, and other District Sales Managers was the supervision of another District Sales Manager in the New York Territory. At times, the position Pepe held at Rival may be referred to as the District Sales Manager position.

nants of good faith and fair dealing in connection with his alleged employment contract. *See id.* at Third Count, ¶ 2.

### 2. *Initial Employment with Rival*

In 1989, Pepe joined Rival as a District Sales Manager responsible for a territory which included New York, New Jersey and parts of New England (the "New York Territory"). *See* Pepe Cert. ¶ 1. Upon commencing employment at Rival, Pepe did not sign an employment contract. *See* Deposition of Patrick Pepe ("Pepe Dep.") at 191; Defendant's Rule 56.1 Statement ¶ 2.

Once Pepe began his employment, Rival sent a copy of The Rival Company Sales, Administrative & Clerical Associates Handbook (the "Rival Associate Handbook") to his home in New Jersey. *See* Pepe Cert. ¶ 45. Pepe stated he relied on the Rival Associate Handbook "as outlining company policy." *Id.* at ¶ 48. However, after receiving the Rival Associate Handbook, Pepe stated he reviewed the portions "which seemed important." *Id.* at ¶ 46. Pepe stated he reviewed "portions relating to performance and benefits." *Id.*

The Rival Associate Handbook included a section titled the Associate Handbook Statement ("Associate Handbook Statement"). *See* Rival Associate Handbook at 2. Appearing on page two of the Rival Associate Handbook following a message from the President of Rival, the Table of Contents and the Company Mission Statement, the Associate Handbook Statement provides:

> This Rival Associate Handbook is by no means intended to cover every facet of the Associate–Employer relationship. Regardless of the manner or duration of the Associate's compensation, nothing contained herein shall create employment for a definite term and the statements made herein are simply general statements of THE RIVAL COMPANY ("THE COMPANY") policy. Without prior notice and at any time for any

reason, the Company specifically reserves the right to:

> 1. MODIFY THESE POLICIES,
> 2. APPLY THEM IN A MANNER THAT RETAINS DISCRETION IN THE COMPANY, OR
> 3. REFRAIN FROM APPLYING THESE POLICIES

> *Associates may terminate their employment without prior notice at any time for any reason, The Company may do the same.* **All oral statements made at any time regarding employment** and any written employment rules, statements, policies or Rival Associate Handbooks of any form or nature issued prior to this manual **are hereby revoked.** The Company's policies may not be changed except in writing by the President of The Company.

*Id.* (emphasis added). Pepe admitted he did not read the Rival Associate Handbook Statement; he stated that nothing about the page "made it seem any more important than the first few pages that went before it." Pepe Cert. at ¶ 47.

Pepe asserts he interpreted the Rival Associate Handbook as "containing promises of the company with respect to many things including promotion, transfer, corrective action, and termination." *Id.* The Promotions and Transfers section of the Rival Associate Handbook reads:

> It is the policy of The Rival Company to fill vacancies wherever possible by transfer or promotions. The best qualified individual will be selected. Primary consideration will be given to qualified associates when trying to fill vacancies.

> \*　\*　\*　\*　\*　\*

> ● Those who apply will be considered on the basis of ability, experience, overall job performance and attendance. Screening interviews will be done by the Personnel Manager with the interviewing supervisor making the final selection.
> ● The first 30 days will be considered a probationary period, as it is in all

positions within the Company. The person selected will be given the chance to perform the new job in a satisfactory manner.

- If there are no qualified applicants for the job within Rival, it will be filled by other means.
- The Personnel Department will notify all applicants when a position has been filled.

Rival Associate Handbook at 17.

The Corrective Action Procedure section of the Rival Associate Handbook provides:

From time to time, problems arise that relate to attendance, work performance or disruptive behavior. Every associate will be given the opportunity to correct such problems. Corrective actions will follow a 3–step plan:

*Step # 1—Counseling*

Your supervisor will counsel you about the problem. They [sic] will work with you to correct the problem. This will be considered your "Verbal Warning." If the problem is corrected nothing further will be said. It will not be held against you in any way.

*Step # 2—Written Warning*

Should the problem continue, your supervisor will counsel you again. They [sic] will put a statement of the problem in written form, a copy of which will go to your personnel file. Receipt of a written warning automatically places you on thirty (30) days probation. Your signature is required on this form as acknowledgment that you have read and understand the form. If the problem continues, the supervisor is required to move you to Step # 3.

*Step # 3—Termination*

To insure fair play, no terminations under this policy are permitted without the approval of the department head. No one will be terminated without every possible assistance and fair warning.

Id. at 20. Pepe argues, based upon the Corrective Action Procedures listed in the Rival Associate Handbook, he had an implied employment contract that he would not be terminated without cause. *See* Opposition Brief at 35. Further, Pepe states no one at Rival ever told him he was an at-will employee. *See* Pepe Cert. ¶ 48. Nevertheless, at page two of the Rival Associate Handbook it is clearly, plainly stated that:

... [N]othing contained herein shall create employment for a definite term .... Associates may terminate their employment without prior notice at any time for any reason, The Company may do the same.

Rival Associate Handbook at 2.

### 3. *Employment 1989—1997*

In 1992, Pepe was promoted to Senior District Sales Manager. *See id.* at ¶ 4. The Senior District Sales Manager position involved "supervising a [D]istrict [S]ales [M]anager, selling Rival's products, increasing the number of customers and sales volume in the territory, implementing pricing and advertising programs that were approved by senior management, controlling and administering the advertising budget," communicating with the home office and maintaining good customer relations for Rival in the New York Territory. *Id.* at ¶ 5.

### 4. *Performance at Rival*

During the first eight years of his tenure at Rival, Pepe was supervised and reviewed by Karl Zehner ("Zehner"). *See* Plaintiff's Rule 56.1 Statement at ¶ 14. Zenner testified that he received "a lot of feedback" from Pepe and probably spoke to him every day. Zehner Dep. at 36. Zehner also testified that Pepe expanded both the volume of sales and the customer base of the New York Territory. *See* Zehner Dep. at 32; *see also* Pepe Cert. ¶ 8.

Pepe attained eighty-five percent of his sales quota in 1996 and received a $12,-

500.00 bonus. *See* Jacob Supplemental Cert., Exhibit A (the "1996 Bonus Review"); Pepe Dep. at 321. Pursuant to the 1996 Bonus Review, Pepe received the "Threshold" bonus for team work, the "Target" bonus for placement and profitability, and the maximum bonus for advertising. *See* 1996 Bonus Review. Pepe testified that "Threshold" bonus was "the first level of bonus pay out." Pepe Dep. at 322. Pepe also testified that the effort for the "Target [bonus was] what they wanted you to achieve." *Id.*

Under the heading "Teamwork" the 1996 Bonus Review stated:

> Pat did a fair job on teamwork goal with Federated. Communication better at end of the year, but needs much improvement with other associates calling on Federated. Pat must focus on re-establishing Rival as [sic] major vendor for Federated.

1996 Bonus Review.

Zehner described advertising administration as an area from which District Sales Managers "could make contributions to profitability of the company." Zehner Dep. at 30. Zehner complimented Pepe on advertising administration and commented, that during his last few years at Rival, Pepe "was under budget" for New York Territory advertising. *Id.* Pepe contends Cindy Francis ("Francis"), Director of Advertising, consistently complimented him on his advertising administration. *See* Pepe Cert. ¶¶ 25, 27.

According to Manning, Pepe turned in the worst performance of all Rival District Sales Managers in advertising administration. *See* Manning Dep. at 108–109. When asked about administration skills in general, Manning described Pepe as "not somebody that you'd count on." *Id.* In addition, various other members of Rival senior management criticized Pepe concerning his administrative and communication skills. *See* Deposition of Stanley Biggs ("Biggs Dep.") at 75–86 (discussing Pepe's deficient computer skills and Pepe's failure to respond to administrative inquiries from Francis and himself); Francis Dep. at 9–12, 47–54 (noting that Pepe did not timely cancel his "ad reqs" and had a greater problem with administrative issues than other Rival salespeople).

### 5. *The Secular Trust*

In 1996 Pepe was invited to participate in the Secular Trust, a pension plan established for highly compensated Rival personnel. *See* Pepe Cert. ¶ 55; Manning Dep. at 78–79; Biggs Dep. at 87. Rival made a contribution to the Secular Trust for each plan participant equal to twelve percent of his or her yearly salary. *See* Pepe Cert. ¶ 55.

Pepe argues his inclusion in the Secular Trust ensured his employment with Rival until his retirement. *See* Opposition Brief at 37; *see also* Pepe Cert. ¶ 57; Pepe Dep. at 307. Pepe asserts Manning told him inclusion in the Secular Trust guaranteed "a comfortable retirement from Rival." Pepe Cert. ¶ 56. Pepe also asserts William Endres ("Endres"), then the Vice President of Sales, described the Secular Trust as a "great experience" and told Pepe "[y]ou have a long and enhanced opportunity until retirement to be here." Pepe Dep. at 307.

The Secular Trust Agreement (the "Secular Trust Agreement"), which Pepe asserts provided an express or implied employment contract, does not contain any assurances concerning employment at Rival. *See* Secular Trust Agreement; *see also* Manning Dep. at 80; Biggs Dep. at 87. On the first page, the Secular Trust Agreement identifies its purpose—to act as a retirement plan. *See* Secular Trust Agreement at 1. In the definition section, the Secular Trust Agreement defines a "Terminated Participant" as "a person who has been a Participant, but whose employment has been terminated other than by death." *See id.* at 8.

Further the Secular Trust Agreement provides for a determination of benefits when a participant terminated his or her

participation for reasons other than death. *See id.* The Secular Trust Agreement indicates the time for distribution of benefits. The provision provides:

> Except as limited by Sections 5.4 and 5.5, whenever the Trustee is directed, pursuant to this Agreement, to make a distribution, the distribution may be made as soon thereafter as practicable, but in no event later than the 60th day after the close of the Plan Year in which the latest of the following events occurs: (a) the date on which the Participant attains the earlier age of 65 *or* the Normal Retirement Age specified herein; (b) the 10th anniversary of the year the Participant commenced participation in the Plan; or (c) the date the Participant terminates his or her service with the Company.

*Id.* at 13.

The Secular Trust Agreement also has a choice of law provision titled "Governing Law." *Id.* at 22. The choice of law provision states: "To the extent not preempted by the Employee Retirement Income Security Act, this Trust Agreement and the Trusts created herein shall be construed, regulated and administered under the laws of the State of Missouri...." *Id.*

Pepe admitted no member of Rival management told him participation in the Secular Trust would guarantee his employment until retirement. *See* Pepe Dep. at 306. Pepe further admitted he did not read the terms of the Secular Trust Agreement until after he was terminated. *See id.* at 185–186, 189–190. Pepe also admitted he knew at least one member of the Secular Trust, Endres (Vice President of Sales), who was fired by Rival. *See id.* at 190. When asked during his deposition if he believed his inclusion in the Secular Trust meant he could not be fired "[u]nder all circumstances," Pepe answered:

> Well, I don't think anybody, anyone would think under all circumstances. I would think if I continued to perform my duties as I've been in the past and planned on continuing to do in the future

and continued to get good job reviews and perform as I was performing, then I would be there [at Rival] until 65.

*Id.* at 307.

### 6. *Changes in Rival Management*

Zehner voluntarily resigned from Rival on 25 October 1997; at that time Witter and Scott Royal–Ferris ("Royal–Ferris"), took over the responsibility of supervising both Pepe and Philip Pruner, the District Sales Manager for the Ohio territory. *See* Plaintiff's Rule 56.1 Statement ¶¶ 20–21. About two weeks later, in early November 1997, Royal–Ferris informed Pepe of his intention to terminate Thomas Frain ("Frain"), the District Sales Manager whom Pepe supervised. *See id.* at ¶ 22.

Pepe complained about the change because the New York Territory always had been covered by at least two District Sales Managers. *See id.* at ¶¶ 23–24; *see also* Pepe Cert. ¶ 34. In addition, Frain had been responsible for calling on most of the smaller retailers, which allowed Pepe to focus his efforts on the larger accounts in the territory, including I. Lehrhoff & Company ("Lehrhoff"). *See* Plaintiff's Rule 56.1 Statement ¶ 22; *see also* Pepe Cert. ¶ 34. On 5 December 1997, Frain was terminated and Pepe became responsible for the New York Territory. *See* Plaintiff's Rule 56.1 Statement ¶¶ 25–26.

Pepe argues the termination of Frain was part of a scheme "to expose him" and "lead to his termination." *Id.* at ¶ 27 (citing Witter Dep. at 99); *see also* Opposition Brief at 5. Accurately stated, Witter testified the decision to fire Frain was motivated by three factors—(1) the declining sales volume in the New York Territory no longer supported both positions, (2) Rival management did not believe "they were getting the most out of [Frain]" and (3) Royal–Ferris wanted to show Pepe was working only for Lehrhoff and to "uncover a lot that [Pepe] was not doing." Witter Dep. at 99. Witter further testified the change was not designed to make Pepe fail, but

rather "to see how [Pepe would] respond to the bigger challenge" of calling on other customers in the New York Territory. *Id.*

Pepe states that after the firing of Frain, Stan Biggs ("Biggs"), Vice–President and Treasurer of Rival, and Witter began "harassing him with questions and criticizing him" regarding various aspects of his advertising administration. Pepe Cert. ¶ 18; Plaintiff's Rule 56.1 Statement ¶ 28.

Following Zehner's departure, members of Rival management began to question Pepe about the New York Territory advertising. *See, e.g.,* Biggs Dep. at 82–86; Witter Dep. at 39. Biggs requested Pepe start following company policy by submitting dealer debits, documentation which proves that an advertisement has been run. *See* Biggs Dep. at 82–84. In addition, Witter and Biggs both questioned the practice Pepe employed of allocating advertising money from smaller accounts to Lehrhoff. *See id.* at 85–86; *see also* Witter Dep. at 39 ("[t]here were some questions about the advertising of the New York market.").

Biggs and other members of Rival senior management thought Pepe was focusing on one particular account, the Lehrhoff account, to the exclusion of other accounts in the New York Territory. *See* Biggs Dep. at 89; Deposition of William Yager ("Yager Dep.") at 23–24. William Yager ("Yager"), President and Chief Operating Officer of Rival, testified he believed Pepe was "working" for Lehrhoff. *See* Yager Dep. at 23. Biggs stated he believed Pepe was loyal to Lehrhoff and not Rival. *See* Biggs Dep. at 89.

Biggs testified Pepe had shown Arthur Lehrhoff, the Chief Executive Officer of Lehrhoff, a confidential internal pricing memorandum, addressing "special deals" on pricing. *See id.* Pepe argues he did not give the confidential memorandum to anyone at Lehrhoff. *See* Plaintiff's Rule 56.1 Statement ¶ 47. Pepe offered the testimony of Arthur Lehrhoff, who stated he

took the memorandum from Pepe's desk. *See* Lehrhoff Cert. ¶ 9.

Pepe contends the criticism concerning his advertising administration represented a departure from previously accepted practices at Rival. *See* Pepe Cert. ¶¶ 21, 24. Specifically, Pepe argues his continued receipt of the maximum advertising bonus and comments by his previous supervisor, Zehner, demonstrate his skill in advertising administration. *See* Opposition Brief at 2; Pepe Cert ¶ 25; *see also* Zehner Dep. at 30. Further, Pepe argues that he was consistently under budget and received compliments concerning his advertising administration. *See* Opposition Brief at 2–3; Pepe Cert ¶ 25.

### 7. *Reorganization*

On 1 April 1998, Mark Bittner ("Bittner") was hired by Rival as the Vice President of Sales. *See* Bittner Dep. at 37. Before joining Rival, Bittner had reorganized the sales organization of thirteen other companies. *See id.* at 158. At the outset, it is important to recognize that Pepe has failed to offer any evidence, or even argue, Bittner had any motivation to harm Pepe or otherwise terminate him for Rival other than for legitimate, non-discriminatory business reasons.

During his first few weeks of employment, Bittner reviewed the existing sales structure and determined a reorganization would benefit Rival. *See id.* at 46, 119–120. Bittner believed Rival should focus more on national accounts. *See id.* at 48. Specifically, Bittner believed Rival would achieve greater sales by replacing the District Sales Manager positions with outside sales representative agencies which would be paid only for the sales they generated. *See id.* at 176–719. Bittner planned "to eliminate all of the direct selling positions that did not entail national accounts." *See id.* at 49. Bittner presented his ideas to Yager and Manning, both of whom agreed with his proposed reorganization (the "Reorganization"). *See id.* at 46–48; Yager Dep. at 15–16, 20. Significantly, Pepe

does not contest the fact that the Reorganization occurred.

During the decision-making stage of the Reorganization, Bittner questioned the strength of three markets, those covered by Pepe (then age 47), Paul Curlett ("Curlett") (then age 57) and Phil Lapenta ("Lapenta") (then age 35). *See* Bittner Dep. at 136; Butler Cert. ¶ 2. He recommended terminating all three employees based on the decline in revenue in all three territories. *See* Bittner Dep. at 136.

Yager and Manning agreed with Bittner's assessment of Pepe and Lapenta, but disagreed concerning Curlett. *See* Yager Dep. 16–17, 23–24, 33; Manning Dep. at 33. Yager believed Curlett should not be terminated because Curlett "deserved a chance to be accountable in the future." *Id.* at 16–17. Manning felt that Curlett should be retained because companies in his territory had "disappeared" and many "key accounts … were no longer in business." Manning Dep. at 34. Manning did not know enough to judge Bittner's evaluation of Lapenta.[3] *See id.* at 37–38. As a result of the Reorganization, all seven District Sales Manager positions were replaced with outside sales representative agencies. *See* Bittner Dep. at 49. These outside sales representative agencies handle the customers previously serviced by the District Sales Managers. *See id.* This replacement decreased Rival's costs because, unlike the District Sales Managers, the outside sales representative agencies were not on Rival's payroll. *See id.* at 178–179.

#### 8. *Regional Sales Manager Position*

The Reorganization eliminated all of the District Sales Manager, Field Sales Manager and the National Account Manager positions at Rival and created the new Regional Sales Manager positions. *See* Bittner Dep. at 47–49. Bittner explained that there was a "world of difference" between the District Sales Manager position and the Regional Sales Manager position. *Id.* at 167.

The Regional Sales Manager job was not a selling position. *See id.* The Regional Sales Manager position was supervisory in nature, involving the hiring and overseeing of outside sales representative agencies. *See id.* at 164; *see also* Pruner Dep. at 118. Customer contact, which represented a significant portion of the District Sales Managers' time would be primarily handled by outside sales representative agencies. *See* Defendant's Rule 56.1 Statement ¶ 48; Bittner Dep. at 174; Manning Dep. at 107. The Militti Group and Synergy Sales were retained to call on customers in areas covered by the New York Territory. *See* Defendant's Rule 56.1 Statement ¶ 48; Bittner Dep. at 174; Manning Dep. at 107.

Regional Sales Managers covered a more extensive area than District Sales Managers. *See* Bittner Dep. at 164; *see also* Pruner Dep. at 118. For example, the Regional Sales Manager position, which Pepe claims he should have been appointed to, supervised accounts in Michigan, Ohio, Pennsylvania, New York, New Jersey, Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island and the PHD national account (the "East Territory") (the "East Regional Sales Manager"). *See* Bittner Dep. at 164; *see also* Pruner Dep. at 118.

Due to the supervisory nature of the Regional Sales Manager position, extensive administrative skills were required. *See* Bittner Dep. at 179–180. The administrative aspects of the Regional Sales Manager position resulted in a greater amount of paperwork than the District Sales Managers were responsible for under the old system. *See id.* at 183, 186; Manning Dep. at 113–114. The Regional Sales Manager position also required more

---

**3.** Witter agreed with the elimination of Pepe's position, but disagreed with the elimination of Lapenta position because Lapenta's business was up twenty-five percent even though he had lost two million dollars in accounts. *See* Witter Dep. at 169–170.

frequent communication with, and prompt responses to, the home office than the District Sales Manager position. *See* Bittner Dep. at 183–184.

### 9. *Selection of a Regional Sales Manager*

Bittner testified he considered every District Sales Manager, including Pepe, for the new positions created by the Reorganization. *See* Bittner Dep. at 120. According to Bittner, he placed "the best people in the best jobs." *See id.* Bittner did not, however, seek applications for the new Regional Sales Manager positions. *See id.* In fact, neither Pepe nor any of the other District Sales Managers applied for, or were aware of, the new positions prior to implementation of the Reorganization. *See, e.g.,* Pruner Dep. at 117–118.

To select the most qualified people, Bittner asked Witter, based upon his experience as their supervisor, to rank the District Sales Managers. *See* Bittner Dep. at 96. Bittner testified:

> I asked Tom Witter to rank his direct reports. And I wanted to see the best and I wanted to see the worst and I wanted him to rank them in terms of all qualifications of the job and contributions and strategic thinking and planning and promotional activity and general management characteristics. And he ranked his direct reports.

*Id.* Witter testified he considered the candidates and ranked the District Sales Managers based upon his "perception of the sales job" done by each of them. *See* Witter Dep. at 37. As part of his rankings, Witter considered both the District Sales Managers responsiveness to, and communications with, the home office. *See id.*

Witter ranked Pruner as the best candidate of the seven District Sales Managers. *See id.* Specifically, Witter testified the principal reason he ranked Pruner first

was because of "his aggressiveness and his thoroughness in communication." Witter Dep. at 38. Pepe was ranked "dead last as the weakest member of the sales team." Bittner Dep. at 98. Based in part on these rankings, Bittner placed Pruner in the Regional Sales Manager position overseeing the East Territory. *See id.* In addition, Bittner testified he also considered the fact that no one he spoke with had anything negative to say about Pruner's work performance; as well, no one with whom he spoke had anything positive to say about Pepe's work. *See id.* 112–113.

Witter explained several of the reasons for his negative evaluation of Pepe. *See* Witter Dep. at 38–39. The primary reasons for ranking Pepe last were: (1) Pepe was very difficult to reach by phone and (2) "he didn't have much computer training" and despite several offers to take classes in Kansas City, Pepe never scheduled an appointment. *See id.* at 38. The secondary reasons for ranking Pepe last included: (1) Pepe did not respond punctually to e-mails, (2) Pepe was unprepared for a sales presentation Witter attended, (3) Pepe did not adequately focus on, and even ignored, various accounts in his territory, (4) Pepe did not know how to get to an account on Long Island and (5) Pepe did not cancel "ad reqs" on time, but only canceled them at the end of the fiscal year to come in under budget. *See id.* at 38–39.

Pepe disputes all the reasons Witter gave for his negative ranking of Pepe. *See* Pepe Cert. ¶¶ 26–37; *see also* Moving Brief at 8–10. Pepe stated he was never unprepared for a sales meeting and offered the testimony of Mark Opfell, Vice President of Lehrhoff, to confirm that he never found Pepe unprepared for a sales meeting.[4] *See* Pepe Cert. ¶ 33; *see also* Opfell Cert. ¶ 9. Pepe also asserts that while he may not have been reachable at his home office, he could always be reached by cell phone even if he was out on the road. *See* Pepe Cert. ¶ 28. Pepe

---

**4.** This is consistent with the observation that Pepe focused almost exclusively on Lehrhoff, and indeed acted like he worked for Lehrhoff. *See* Biggs Dep. at 89; Yager Dep. at 23–24.

also disputes that his computer skills were deficient. *See id.* at ¶ 31. It appears, giving Pepe the benefit of all favorable inferences, all of his disputation goes to whether Rival was right in its business judgment of Pepe's worth to the company. This, however, is not the issue in the case.

### 10. *Pepe's Allegations of Age Discrimination*

Pepe testified he was denied the Regional Sales Manager position for the East Territory based upon his age. *See* Pepe Dep. at 166. At the time of the Reorganization, Pruner was 31 years old and Pepe was 47 years old. *See* Butler Cert. ¶ 2. The difference in his and Pruner's age is the only evidence Pepe provides of the alleged discrimination.

Pepe testified Rival discriminated against him by failing to appoint him to the Regional Sales Manager position held by Pruner. *See* Pepe Dep. at 392. Comparing himself and Pruner, Pepe testified he should have been appointed to the East Regional Sales Manager position

> based on my experience with the, my experience within The Rival Company, within New York, New Jersey, New England territory that [Pruner] covers, my experience versus, which was a lot more, versus his less experience, my ability to, my seniority versus a lot less seniority in knowing the company. My rapport and my knowledge of the New York customers. My being a team leader at Federated. My getting a great job review for great performance in the New York market, which was the toughest, one of the toughest markets in the country, versus no experience in that market at all.

Pepe Dep. at 165.[5]

Pepe admitted in his deposition he does not know if Bittner was out to "fire the old

people." Pepe Dep. at 506–507. Pepe argues, however, Witter and Royal–Ferris by firing Frain and making him responsible for the New York Territory "set [him] up to fail." Opposition Brief at 27. As with much of Pepe's opposition, this is simply argument which is unsupported by fact. Pepe argues this conduct tainted the decision made by Bittner to terminate him. *See id.* There is no evidence to support this argument.

Rival presented evidence that the average age of personnel in the Kitchen Sales Organization *increased* following the Reorganization. *See* Butler Cert. ¶ 2; *see also* Defendant's Rule 56.1 Statement ¶ 12. In addition, Rival noted the District Sales Manager positions held by Lapenta, then age 35; Mike Belliston, then age 38; Bill Korbin, then age 40 were all eliminated. *See* Moving Brief at 4. Further, Curlett, then age 57, was appointed to a Regional Sales Manager position. *See id.; see also* Butler Cert. ¶ 2.

Bittner considered all of Rival's former District Sales Managers for the new Regional Sales Manager positions. *See* Bittner Dep. at 120. Witter testified he ranked Pruner first among the District Sales Managers because of "his aggressiveness and his thoroughness in communication." Witter Dep. at 38. Bittner also considered the fact that no one with whom he spoke had anything negative to say about Pruner's work performance; as well, no one with whom he spoke had anything positive to say about Pepe's work. *See* Bittner Dep. at 112–113. Based upon his extensive experience reorganizing company sales forces, Bittner appointed Pruner as the East Regional Sales Manager. *See id.* at 120. Bittner believed Pruner would make a good Regional Sales Manager and that Pruner was the best qualified candidate for the East Territory. *See id.*

---

**5.** Due to the number of accounts located in the territory and the negotiating skills possessed by many of the New York buyers, the New York Territory was regarded by Rival senior personnel as "one of the toughest mar-

kets in the county." Deposition of Carl Zehner ("Zehner Dep.") at 28, 35; *see also* Deposition of Thomas Manning ("Manning Dep.") at 64; Objections and Admissions to Plaintiff's Rule 56.1 Statement ¶ 4.

Manning agreed with Bittner's decision. *See* Manning Dep. at 33–34.

Pepe testified that following his termination "Pruner seemed to be there the next week overseeing the [New York] [T]erritory." *Id.* at 224. Pepe admitted, however, he does not know the scope of the East Regional Sales Manager position or the duties associated with it. *See* Pepe Dep. at 31, 34, 152. In addition, he could not describe the difference between the Regional Sales Manager and the District Sales Manager positions. *See id.* at 283–284 ("I think basically they are, basically the same. Probably a larger geographic area for regional.")

Pepe admitted he does not know the criteria Bittner used in making decisions concerning the Reorganization. *See id.* at 491, 507–508. Pepe also admitted he has no knowledge of Pruner's qualifications or his performance as a District Sales Manager. *See id.* at 166. In addition, Pepe conceded management decides which candidate is best qualified for the Regional Sales Manager position. *See id.* at 203.

### 11. *Termination*

On 1 May 1998, Bittner called Pepe at home and left a message requesting Pepe meet him at the Newark Airport Hilton on 4 May 1998. *See* Pepe Cert. ¶ 58. On 4 May 1998, Bittner and Pepe met at the Newark Airport Hilton. *See id.* at ¶ 59. Bittner informed Pepe he was being terminated by Rival. *See id.* at ¶ 60; Bittner Dep. at 128. As explained, several Rival managers had serious questions, based upon legitimate, non-discriminatory business concerns, about Pepe's work performance and loyalty. Nevertheless, Pepe was not terminated for poor work performance. *See* Moving Brief at 2. Reviewing the evidence presented,[6] in light of all inferences in favor of Pepe, it appears the employment of Pepe was terminated after his position was eliminated in a business-driven reorganization. There is no genuine issue of material fact; Pepe has not offered any evidence or pointed to any evidence to establish or infer that age discrimination played a role in his termination.

### Discussion

### A. *Standard for Summary Judgment*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether genuine issues of material fact exist and whether Rival is entitled to judgment as a matter of law.

A District Court may not resolve factual disputes in a motion for summary judgment. *See Linan–Faye Constr. Co. v. Housing Auth.*, 49 F.3d 915, 926–27 (3d Cir.1995) ("[A]t the summary judgment stage, 'the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Desvi, Inc. v. Continental Ins. Co.*, 968 F.2d 307, 308 (3d Cir.1992) ("[T]hreshold inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of

---

**6.** Arguments in Opposition Brief, the Plaintiff's Rule 56.1 Statement or otherwise are not sufficient to create a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e)) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'"); *Campbell–El v. District of Columbia*, 874 F.Supp. 403, 406–407 (D.D.C. 1994) (declaration, under oath, asserting a "belief" is insufficient to defeat a motion for summary judgment). Pepe had not done more than argue some metaphysical doubt. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). He has not come forward with the specific facts necessary to defeat this motion. *See* Fed.R.Civ.P. 56(e).

fact because they may reasonably be resolved in favor of either party' ") (citations omitted).

When considering a motion for summary judgment, all evidence submitted "must be viewed in the light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1077 (3d Cir.1992) (citing *Erie Telecommunications v. Erie*, 853 F.2d 1084, 1093 (3d Cir.1988)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Kowalski v. L & F Products*, 82 F.3d 1283, 1288 (3d Cir.1996); *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 & n. 2 (3d Cir.1983) (the court must resolve "all inferences, doubts and issues of credibility ... against the moving party"), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As Rule 56(e) makes clear, once the moving party files a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. *See* Fed. R.Civ.P. 56(e); *see also Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

As the Supreme Court stated in *Matsushita*, once the moving party has demonstrated the absence of a genuine issue of material fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." 475 U.S. at 586, 106 S.Ct. 1348. Indeed, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348 (emphasis in original) (citations omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505) *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

"[T]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Gomez v. Allegheny Health Serv., Inc.*, 71 F.3d 1079, 1085 (3d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996); *see also Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995); *United States v. 717 So. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993) (stating "[a]lthough entitled to the benefit of all justifiable inferences from the evidence, the nonmoving party may not ... withstand summary judgment by resting on mere allegations or denials in the pleadings.") (citations omitted); *Players Int'l, Inc. v. United States*, 988 F.Supp. 497, 500 (D.N.J.1997) (stating "the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.") (citations omitted); *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 534 (D.N.J.1989), *aff'd without op'n*, 899 F.2d 1218 (3d Cir.1990). Conclusory statements and arguments, alone, do not raise triable issues which preclude summary judgment. *See Ridgewood Bd. of Ed. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (speculation and conclusory allegations are insufficient to forestall summary judgment); *Sterling Nat'l Mortgage Co., v. Mortgage Corner, Inc.*, 97 F.3d 39, 44 (3d Cir.1996) ("[m]ere speculation about the possibility of the existence of such facts" does not raise a triable issue to defeat a motion for summary judgment).

"The nonmoving party creates a genuine issue of material fact if [he or she] provides [or points to] sufficient evidence to

allow a reasonable jury to find for him [or her] at trial." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995) (citations omitted). If the nonmovant fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the ultimate burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brewer*, 72 F.3d at 330; *Siegel*, 54 F.3d at 1130–31; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993) (stating "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant").

In *Anderson*, the Court held "[i]f the evidence [submitted by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993) (observing that for issue to be considered genuine, nonmoving party must adduce more than a mere scintilla of evidence in its favor). In addition, when the factual context renders a claim implausible, the non-movant has a heavier burden of production in opposing a motion for summary judgment. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. "Summary judgment may present the district court with an opportunity to dispose of meritless cases and avoid wasteful trials." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996) (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548).

Discovery in this case has been completed. A review of all the submissions reveals no genuine factual dispute that can be described as "material" in light of the controlling case law. Therefore, judgment may be awarded as a matter of law.

### B. NJLAD Claim

Pepe alleges discrimination on the basis of age in violation of the NJLAD. *See* Complaint, First Count ¶¶ 10, 13. The Complaint states:

> After Plaintiff's termination, Defendant announced an opening for the position of Regional Sales Manager involving the oversight of sales in New York, New England and Cleveland. As set forth above, Plaintiff was already responsible for the New York and New England territory. Plaintiff was qualified but was not even given the opportunity to apply for this position. Instead, Defendant, without Plaintiff's knowledge appointed an employee who was significantly younger, less qualified, less senior and less experienced and who had little or no contact with the New York and New England territory
>
> \* \* \* \* \* \*
>
> Defendant intended to discriminate against Plaintiff because of his age and, in fact, did discriminate against Plaintiff by discharging him from employment because of his age in violation of New Jersey's Law Against Discrimination, N.J.S.A. 10:5–1, et. seq. ("NJLAD"). As such, Plaintiff's civil rights have been violated.

*Id.*

The NJLAD provides in pertinent part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of ... age ... of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in com-

pensation or in terms, conditions or privileges of employment. . . .

N.J.S.A. 10:5–12.

■ To prevail on an NJLAD claim, Pepe must establish the discriminatory consideration, his age, played a determinative role in his termination. *See Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208, 723 A.2d 944 (1999) (extending NJLAD to include all claims alleging age played a role in the employment decision); *Greenberg v. Camden County Vocational Technical Schools*, 310 N.J.Super. 189, 198, 708 A.2d 460 (App.Div.1998) (citing *Miller v. CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir.1995) (plaintiff must show "the prohibited consideration played a role in the decisionmaking process and that it had a determinative influence on the outcome of that process."))

■ Under the NJLAD, discrimination may be alleged in various contexts. In the present case, Rival interprets the Complaint[7] as alleging a termination and replacement claim. *See* Moving Brief at 11. A plaintiff seeking to survive summary judgment on a termination and replacement case must demonstrate "by a preponderance of the evidence" that: (1) he belongs to a protected category, (2) in performing his job he met his employer's legitimate expectations, (3) he nevertheless was fired and (4) he was replaced by a significantly younger candidate to permit an inference of age discrimination. *See Bergen Commercial Bank*, 157 N.J. at 208, 723 A.2d 944; *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 550, 569 A.2d 793 (1990); *Mogull v. CB Commercial Real Estate Group, Inc.*, 319 N.J.Super. 53, 64, 724 A.2d 863 (App.Div.1999), *certif. granted*, 161 N.J. 150, 735 A.2d 575; *Greenberg*, 310 N.J.Super. at 198, 708 A.2d 460; *see also Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989); *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1114 n. 5 (3d

Cir.1997) (Roth, J., concurring in part dissenting in part); *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.); *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995); *MCI*, 829 F.Supp. at 1449.

■ In cases where the position held by the discharged employee was eliminated, or the discharged employee was not replaced, he or she must prove that a younger employee was either retained or treated more favorably. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433, (1996); *Showalter v. University of Pittsburgh Medical Center*, 190 F.3d 231, 234 (3d Cir.1999); *EEOC v. MCI Int'l, Inc.*, 829 F.Supp. 1438, 1449 (D.N.J.1993).

■ Pepe contends the Complaint alleges a failure to promote claim. *See* Opposition Brief at 23. A plaintiff seeking to overcome summary judgment on a failure to promote claim must demonstrate that (1) he is a member of a protected class, (2) he applied and was qualified for a position for which the employer was seeking applicants, (3) he was rejected despite adequate qualifications, and (4) after his rejection, the position was awarded to someone with equivalent or lesser qualifications who was sufficiently younger to create an inference of age discrimination. *See Erickson*, 117 N.J. at 550, 569 A.2d 793; *Andersen v. Exxon Co.*, 89 N.J. 483, 492, 446 A.2d 486 (1982); *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 84–85, 389 A.2d 465 (1978); *Mogull*, 319 N.J.Super. at 64, 724 A.2d 863; *Greenberg*, 310 N.J.Super. at 198, 708 A.2d 460; *see also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Lawrence*, 98 F.3d at 65; *Waldron*, 56 F.3d at 494; *Sempier*, 45 F.3d at 728.; *Waldron*, 56 F.3d at 494; *Johnson v. Penske Truck Leasing Co.*, 949 F.Supp. 1153, 1170 (D.N.J.1996).

---

**7.** For Pepe's interpretation of the Complaint

see *infra* pages 365–66, 368.

Pepe admits no one at Rival ever made a comment to him which could be considered to be discriminatory based upon age. *See* Pepe Dep. at 29–31.[8] In fact, Pepe offers no evidence of age discrimination and does not contest statistical evidence presented by Rival which indicates the average age in the Kitchen Sales Organization *increased* following the Reorganization. *See* Butler Cert. ¶¶ 4, 6; Defendant's Rule 56.1 Statement ¶¶ 12, 24.

■ Given the difficulty in proving an employer's intent through direct evidence, circumstantial evidence may be used to prove discrimination. *See Bergen Commercial Bank,* 157 N.J. at 209, 723 A.2d 944; *Greenberg,* 310 N.J.Super. at 198, 708 A.2d 460. In such cases, the New Jersey courts follow the burden-shifting analysis established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bergen Commercial Bank,* 157 N.J. at 209, 723 A.2d 944; *Craig v. Suburban Cablevision, Inc.,* 140 N.J. 623, 631, 660 A.2d 505 (1995) (citing *Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 549–50, 569 A.2d 793 (1990) (acknowledging the New Jersey Supreme Court follows the standards and analysis established in Federal discrimination cases for making determinations on NJLAD claims); *Grigoletti v. Ortho Pharm. Corp.,* 118 N.J. 89, 97–98, 570 A.2d 903 (1990); *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 437, 561 A.2d 1130 (1989) (citing *Peper,* 77 N.J. at 81, 389 A.2d 465); *Andersen,* 89 N.J. at 492, 446 A.2d 486; *Peper,* 77 N.J. at 82–83, 389 A.2d 465 (recognizing the approach articulated in *McDonnell Douglas* as the starting point for litigation under the NJLAD)); *see also Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995) ("New Jersey courts in applying the NJLAD generally follow the standards of proof applicable under the [F]ederal discrimination statutes....") (citations omitted); *McKenna v. Pacific Rail Svc.,* 32 F.3d 820, 827 (3d Cir.1994) (citing *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587,

600, 626 A.2d 445 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258 (D.N.J.1994), *aff'd without op'n,* 67 F.3d 291 (3d Cir.1995).

While strict adherence to the *McDonnell Douglas* test is not mandated, the approach is considered an appropriate framework for analyzing unlawful discrimination claims. *See Grigoletti,* 118 N.J. at 98, 570 A.2d 903 (citing *Erickson,* 117 N.J. at 550, 569 A.2d 793) (employing standard and methodology under Federal Equal Pay Act for suit brought under NJLAD on the basis of unequal wages for performance of substantially equal work).

Under the *McDonnell Douglas* approach, the burden of persuasion remains at all times on the plaintiff, but the burden of going forward shifts. *See* 411 U.S. at 802–803, 93 S.Ct. 1817; *see also Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Erickson,* 117 N.J. at 550, 569 A.2d 793; *Andersen,* 89 N.J. at 492–93, 446 A.2d 486. Once a plaintiff demonstrates a prima facie case of discrimination, a presumption that the employment decision was motivated by improper considerations arises. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *Goodman v. London Metals Exchange, Inc.,* 86 N.J. 19, 31, 429 A.2d 341 (1981).

The burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 248, 254 (1981); *Lawrence,* 98 F.3d at 66; *Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 596, 538 A.2d 794 (1988); *Andersen,* 89 N.J. at 492, 446 A.2d 486; *Goodman,* 86 N.J. at 31, 429 A.2d 341, *Peper,* 77 N.J. at 83, 389 A.2d 465. While a defendant need not prove the legitimacy of its proffered reason, some supporting evidence is required. *See Burdine,* 450

---

**8.** Indeed, Pepe offers no evidence of any remark or comment regarding age.

U.S. at 254, 101 S.Ct. 1089; *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994).

Once a defendant proffers a legitimate, non-discriminatory reason for the employment decision, "the presumption of discrimination disappears." *Bergen Commercial Bank,* 157 N.J. at 211, 723 A.2d 944; *see also Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 255 & n. 10, 101 S.Ct. 1089. A plaintiff is then charged with the burden of proving that the legitimate, non-discriminatory reason proffered by the defendant was merely a pretext for discrimination. *See Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Bergen Commercial Bank,* 157 N.J. at 211, 723 A.2d 944; *Andersen,* 89 N.J. at 492, 446 A.2d 486; *Goodman,* 86 N.J. at 32, 429 A.2d 341; *Peper,* 77 N.J. at 83, 389 A.2d 465.

In *Fuentes,* the Third Circuit explained that once a defendant provides a legitimate, non-discriminatory reason for its employment decision, the plaintiff must offer some evidence to discredit the proffered reason in order to avoid summary judgment. 32 F.3d at 764. A plaintiff may not avoid summary judgment merely by showing the employment decision was wrong or even mistaken. *See id.*

A plaintiff must submit either direct or circumstantial evidence from which the factfinder could conclude either the proffered reasons are not credible or discrimination was more likely than not a motivating or a determinative cause of the employment decision. *See id.* at 765; *see also Iadimarco v. Runyon,* 190 F.3d 151, 166 (3d Cir.1999); *Armbruster v. Unisys Corp.,* 32 F.3d 768, 782–83 (3d Cir.1994); *Slohoda v. United Parcel Serv., Inc.,* 207 N.J.Super. 145, 155, 504 A.2d 53 (App. Div.1986), *certif. denied,* 104 N.J. 400, 517 A.2d 403 (1986). Specifically

> The complainant must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of

credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"

*Iadimarco,* 190 F.3d at 166 (quoting *Fuentes,* 32 F.3d at 765). If a plaintiff produces or points to evidence sufficient to cast substantial doubt on the proffered reasons, no additional evidence is required to survive summary judgment. *See Brewer,* 72 F.3d at 331; *Fuentes,* 32 F.3d at 765. Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (a nonmoving party may not successfully oppose a summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *EEOC v. MCI Int'l, Inc.,* 829 F.Supp. 1438, 1451 (D.N.J.1993).

While generally at the summary judgment stage courts may not engage in weighing evidence, a review of the proffered evidence must be made to determine whether sufficient doubt has been cast on the reasons offered by the employer, thereby creating a genuine issue of material fact. *See Lawrence,* 98 F.3d at 67. To meet this burden, a plaintiff must offer or point to competent evidence to demonstrate the proffered reason was merely a ruse for discrimination. *See Iadimarco,* 190 F.3d at 166; *Fuentes,* 32 F.3d at 764; *Stinson v. Delaware River Port Auth.,* 935 F.Supp. 531, 541 (D.N.J.1996), *aff'd without op'n,* 124 F.3d 188 (3d Cir.1997)(to evade summary judgment the plaintiff must produce sufficient evidence so the factfinder could reasonably conclude the reason offered by the employer was fabricated).

The Circuit has indicated that absent a sufficient showing by the plaintiff, courts should not substitute their own judgment, or the judgment of anyone else, for that of the employer. *See Healy,* 860 F.2d at 1220. While this places a burden upon the

plaintiff, this allocation of the burden of proof is necessary in order to maintain an appropriate balance between the discrimination laws and the independence of private employers. *See Fuentes,* 32 F.3d at 765.

The anti-discrimination statutes are designed to protect against discrimination, not to displace employers' discretion in making employment decisions. *See Burdine,* 450 U.S. at 259, 101 S.Ct. 1089 (anti-discrimination statutes were not intended to "diminish traditional management prerogatives"); *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. 1775 (recognizing the importance under Title VII of preserving "an employer's remaining freedom of choice"); *see also Brewer,* 72 F.3d at 332 ("an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason").

Rival contends that Pepe has failed to established a prima facie case of age discrimination because his position was eliminated by a business-driven reorganization. *See* Moving Brief at 11. Pepe does not dispute that a reorganization occurred.[9] *See* Opposition Brief at 23. Instead, Pepe contends Rival misstates his claim as one of a termination and replacement rather than a failure to promote. *See id.* Employing a liberal construction and extending to Pepe the benefit of all reasonable interpretations and inferences, it appears the Complaint sufficiently alleges both a termination and replacement claim and a failure to promote claim. Accordingly, each will be reviewed.

### 1. The Termination and Replacement Claim

As mentioned, the first hurdle Pepe must surmount to avoid summary judgment on his discrimination claim based upon the termination and replacement theory is establishing a prima facie case. *See Bergen Commercial Bank,* 157 N.J. at 210, 723 A.2d 944. As indicated, in order to establish a prima facie case Pepe must demonstrate "by a preponderance of the evidence" that: (1) he belongs to a protected category, (2) in performing his job he met his employer's legitimate expectations, (3) he nevertheless was fired and (4) he was replaced by a significantly younger candidate to permit an inference of age discrimination. *See id.; Erickson,* 117 N.J. at 550, 569 A.2d 793; *Mogull v. CB Commercial Real Estate Group, Inc.,* 319 N.J.Super. 53, 64, 724 A.2d 863 (App.Div. 1999); *Greenberg,* 310 N.J.Super. at 198, 708 A.2d 460; *see also Healy,* 860 F.2d at 1214; *Keller,* 130 F.3d at 1114 n. 5; *Lawrence,* 98 F.3d at 65; *Waldron,* 56 F.3d at 494; *Sempier,* 45 F.3d at 728; *MCI,* 829 F.Supp. at 1449. In cases where the position held by the discharged employee was eliminated or the employee was not replaced he or she must prove that a younger employee was either retained or treated more favorably. *See O'Connor,* 517 U.S. at 309, 116 S.Ct. 1307; *Showalter,* 190 F.3d at 234; *MCI,* 829 F.Supp. at 1449.

Pepe argues he met the first three prongs in establishing his prima facie case. *See* Opposition Brief at 23. Rival disputes whether Pepe performed according to its expectations. Rival also argues Pepe was not replaced by a significantly younger candidate. Accordingly, pursuant to Rival's argument, an inference of age discrimination or alternatively that a younger employee was either retained or treated more favorably is not appropriate. *See* Moving Brief at 11.

Rival argues Pepe is alleging he was terminated and replaced by Pruner. *See* Moving Brief at 11 (citing Complaint ¶ 9). Rival asserts Pruner was appointed to the

---

9. Although Pepe alleges in the Complaint that he was replaced by a younger employee, he appears to have abandoned this claim through the course of discovery and now maintains that he should have been afforded the opportunity to interview, and in fact, should have been hired into the new Regional Sales Manager position presently filled by Phil Pruner. *See* Pepe Dep. at 392; Opposition Brief at 23 ("Pepe has never claimed he was replaced").

Regional Sales Manager position after Pepe was terminated. *See id.;* Pruner Dep. at 117–118. Further, Rival contends the new Regional Sales Manager position created by the Reorganization differed significantly in scope and responsibility from the District Sales Manager position Pepe occupied. *See* Moving Brief at 12–13; Bittner Dep. at 167; Pruner Dep. at 118. Rival argues, therefore, given the difference between the two positions, Pepe cannot be considered as having been replaced. *See id.* While Pepe concedes the Reorganization, he maintains he should have been placed in the Regional Sales Manager position which effectively replaced the District Sales Manager position. *See* Opposition Brief at 23.

A factually analogous case is found in *EEOC v. MCI, Int'l,* 829 F.Supp. 1438 (D.N.J.1993). Bruce Bowen ("Bowen"), one of the plaintiffs in a class action against MCI, was laid off from his position as the Supervisor of Records Management and Procedure for RCAG Global Communications, Inc. ("RCAG"), a company acquired by MCI in May, 1988 (the "Acquisition"). *See id.* at 1466. Bowen, then 44 years old, was responsible for developing and writing policies and procedures for RCAG company-wide. *See id.* At the time of the Acquisition, two people reported to Bowen with respect to records management and he was involved in a special project involving writing systems documentation for the engineering department. *See id.*

MCI argued Bowen could not establish a prima facie case of employment discrimination because his position was eliminated during the Acquisition. *See id.* Policies and procedures at MCI were not devised and documented in one centralized location, as they were at RCAG, but were devised and documented separately by each department. *See id.* Because Bowen was responsible for a function at RCAG which MCI did not perform, MCI argued it eliminated his position. *See id.* Further, MCI argued no one at its Piscataway

facility assumed Bowen's role, or one similar, following his layoff. *See id.*

Bowen argued that his position was not truly eliminated but Shelly Bloch ("Bloch") took over his position because she performed similar job functions to those he had previously performed. *See id.* Bloch was responsible for the administration of MCI's Rye Brook, New York facility and as part of her duties, she made policies and procedures. *See id.*

The court concluded the comparison between Bowen's company-wide position and Bloch's position at the Ryeberg, New York facility did not rebut MCI's claim that Bowen's position was eliminated. *See id.* Based upon the difference in the scope of responsibility between the two positions, the court concluded that no replacement had taken place and therefore granted summary judgment in favor of the defendant. *See id.* at 1467.

■ Rival presents more compelling evidence in the present case then did the defendant in *MCI.* In the instant case all available facts (and favorable inferences) demonstrate that the Regional Sales Manager position differs dramatically from the District Sales Manager position held by Pepe. According to Bittner, the person responsible for the Reorganization and the creator of the Regional Sales Manager position, there was a "world of difference" between the two positions. Bittner Dep. at 164–167. Pepe has offered nothing to contest this position.

The Regional Sales Manager was not a selling position. *See* Bittner Dep. at 179–180. In fact, customer contact, which was very important in the District Sales Manager position, was less relevant to the Regional Sales Manager position because customer visits were now primarily handled by outside sales representative agencies. *See* Bittner Dep. at 174; Manning Dep. at 107. In the case of the old New York Territory two sales representative agencies, the Militti Group and Synergy Sales, had been retained to service the custom-

ers. *See* Defendant's Rule 56.1 Statement ¶ 48; Bittner Dep. at 174; Manning Dep. at 107.

The Regional Sales Manager position involved the supervision of outside sales representative agencies. *See* Bittner Dep. at 179–180. As a result, the Regional Sales Manager position involved extensive administrative work and a greater amount of paperwork than the District Sales Manager position under the old system. *See id.* at 179–180, 183, 186; Manning Dep. at 113–114. In addition, the Regional Sales Manager job required prompt responses to, and more frequent communication with, the home office than the District Sales Manager position did. *See* Bittner Dep. at 183–184.[10]

A comparison of the geographic regions overseen by the Regional Sales Manager position and the District Sales Manager position further exemplifies the differences between the two positions. The Regional Sales Manager position occupied by Pruner is responsible for accounts in Michigan, Ohio, Pennsylvania, New York, New Jersey, Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island. *See* Bittner Dep. at 164; Pruner Dep. at 118, 150. The East Regional Sales Manager also supervised the PHD account on a national basis. *See* Bittner Dep. at 164. The Senior District Sales Manager position held by Pepe, in contrast, covered only New York, New Jersey and part of New England. *See* Plaintiff's Rule 56.1 Statement ¶ 1; Pepe Cert. ¶ 1. In addition, Pepe did not have any national accounts in his territory. *See* Manning Dep. at 120.

Pepe has acknowledged he does not know the differences in the duties and responsibilities between the two positions or even the criteria Bittner used in making

decisions concerning Reorganization. *See* Pepe Dep. at 31, 34–35, 151–152, 168, 491, 507–508. In fact, the only evidence offered by Pepe regarding his alleged replacement was his own supposition that "Pruner seemed to be there the next week overseeing the [New York] territory." Pepe Dep. at 224. This is not sufficient to raise a genuine issue of material fact. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Iadimarco,* 190 F.3d at 156; *MCI,* 829 F.Supp. at 1451.

Like *MCI,* there is simply no evidence of a termination and replacement claim based upon improper age considerations in the instant case. *See MCI,* 829 F.Supp. at 1466. Because of the differences between the Regional Sales Manager position and the District Sales Managers position, Pepe cannot rebut Rival's claim that Pepe was eliminated as part of the Reorganization. *See id.* at 1467. Pepe has not raised a genuine issue of material fact concerning a termination and replacement case based upon improper age considerations. *See, e.g., id.* Pepe, like the plaintiff in *MCI,* cannot prove that Pruner was his replacement; every piece of competent evidence is to the contrary. Under a reduction of in work force analysis Pepe is equally unsuccessful.

In *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Court addressed the application of the *McDonnell Douglas* burden shifting analysis to reduction in work force claims brought under the Age Discrimination in Employment Act, Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.,* ("ADEA"). *See id.* at 309, 116 S.Ct. 1307. O'Connor was employed by Consolidated Coin Caterers Corporation from 1978 until

---

**10.** Relevant deposition testimony reads:

Q How often would you say that the [R]egional [M]angers, the new positions, communicated with the home office?

A They talked to— I would say I would talk to at least each [Regional Sales Manager] daily, if not several times a day.

Q Under the old [D]istrict [S]ales [M]anager model, was that the case?

A No.

Bittner Dep. at 183–184.

10 August 1990, when, at age 56, he was fired. *See id.* O'Connor brought suit under the ADEA. *See id.* The District Court granted summary judgment; O'Connor appealed. *See id.*

The Fourth Circuit stated that to establish a prima facie case under *McDonnell Douglas,* O'Connor must prove (1) he was in the age group protected by the ADEA; (2) he was discharged or demoted; (3) at the time of his discharge or demotion, he was performing his job at a level that met his employer's legitimate expectations and (4) following his discharge or demotion, he was replaced by someone of comparable qualifications outside the protected class. See *O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 546 (1995), *rev'd,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Because O'Connor's replacement was forty years old, the Fourth Circuit concluded that the last element had not been made out. *See id.* In the absence of the *McDonnell Douglas* presumption, the Fourth Circuit concluded O'Connor could not withstand summary judgment. *See id.* at 550. Accordingly, the grant of summary judgment was affirmed. *See id.*

The Court reversed, concluding the protected class analysis discussed in the fourth prong was irrelevant "so long as [the discharged employee] lost out because of his [or her] age." *O'Connor,* 517 U.S. at 312, 116 S.Ct. 1307. Further the Court stated:

> In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger. Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.

*Id.* at 313, 116 S.Ct. 1307.

The Third Circuit applied the *O'Connor* rationale in *Showalter v. University of Pittsburgh Medical Center,* 190 F.3d 231 (3d Cir.1999). In *Showalter,* Donald Showalter ("Showalter") sued his former employer, the University of Pittsburgh Medical Center ("UPMC"), alleging violations of the ADEA. *See id.* at 232–233. UPMC merged two hospitals, the Presbyterian University Hospital ("Presbyterian") and the Montefiore University Hospital ("Montefiore"), but maintained separate security departments at both. *See id.* at 233.

In response to budgetary constraints in May 1994, UPMC eliminated one security supervisor at each hospital. *See id.* George Eror ("Eror") was responsible for making the employment decisions at Montefiore. *See id.* In determining which employees to terminate, the Montefiore security supervisors were compared with each other and not with Presbyterian security supervisors. *See id.* Of four Montefiore security supervisors, Showalter, Leahy, Wright, and Delbane, who were 61, 52, 45, and 38 years old, *see id.,* Delbane was terminated. *See id.*

In August 1994, UPMC required Eror to eliminate another security supervisor from the Montefiore staff. *See id.* UPMC used three types of seniority when making reduction-in-force ("RIF") decisions: job seniority (time employed at a given position), department seniority (time employed in a given department), and hospital seniority (time employed by the hospital). *See id.* Eror testified he used department seniority to make the RIF decision because his understanding was department seniority was always used in RIF decisions. *See id.* at 237. Finding the three remaining supervisors had similar performance records, the decision was made to terminate the individual with the least department seniority. *See id.* at 233.

Showalter had less department seniority than Leahy or Wright, but Wright had less job seniority than Showalter. *See id.* Accordingly, had job seniority rather than

department seniority been used as the basis for making the employment decision, Wright would have been terminated instead of Showalter. *See id.* Further, Showalter had more seniority—of either the job or department variety—than any of the Presbyterian security supervisors. *See id.* Consequently, had UPMC compared both Montefiore and Presbyterian security supervisors, Showalter would not have been terminated. *See id.*

UPMC moved for summary judgment claiming Showalter could not establish a prima facie case under the ADEA because unprotected workers were not retained when Showalter was terminated. *See id.* Further, UPMC claimed Showalter could not discredit the legitimate, nondiscriminatory reason articulated by UPMC for the employment decision or establish that age discrimination motivated UPMC's decision. *See id.* Summary judgment was granted. *See id.* at 233–234.

Relying upon *O'Connor*, the Circuit concluded by virtue of the eight year difference between Showalter and Leahy and the sixteen year difference between Showalter and Wright, a prima facie case of age discrimination had been made out. *See id.* at 236. Further, the Circuit found Showalter presented evidence that the decision to employ department seniority rather than any other type of seniority in the RIF decision was a pretext for age discrimination. *See id.* at 237.

Testimony from David Treece ("Treece"), a human resource employee, directly contradicted Eror's testimony that UPMC had a fixed policy concerning the type of seniority considered when making an RIF decision. *See id.* This led the Circuit to view UPMC's choice of department seniority as suspect. *See id.* Specifically, Treece indicated "it was a common practice that in any reduction in force [he] would look at alternative methods of calculating seniority to determine who would be affected by the layoff." *Id.* Treece also testified "the consequences of using alternative forms of seniority [were discussed] prior to Showalter's termination." *Id.*

In *Iadimarco*, the Circuit reviewed the requirements for establishing a prima facie case and the appropriate pretext analysis employed in discrimination cases. 190 F.3d at 154. In *Iadimarco*, Charles Iadimarco ("Iadimarco") filed an action under Title VII of the 1964 Civil Rights Act against the Postmaster General alleging "reverse discrimination" because he was denied a requested promotion in the United States Postal Service. 190 F.3d at 154.

In 1992, the Postal Service undertook a national reorganization, which consolidated and in some cases eliminated positions. *See id.* After the reorganization, managerial employees were noticed to submit a "991 form" indicating their preferences for available positions. *See id.* The Postal Service permitted employees to apply for positions provided they were within six EAS levels for processing and distribution positions. *See id.* In his 991 form, Iadimarco, a White male, indicated "his preference for three positions: Manager of In-plant Support at Kilmer (EAS 21), Manager of In–Plant Support at Trenton (EAS 21), and Manager of In–Plant Support at Monmouth (EAS 19)." *Id.* The Kilmer and Trenton jobs were filled by White males. *See id.*

Iadimarco was contacted by Robert Towler ("Towler"), a Black male, who was the hiring official for Monmouth, about the open Manager of In–Plant Support position at Monmouth. *See id.* Towler had rated all applicants for the Monmouth Manager of In–Plant Support position according to a "knowledge, skills and abilities" matrix (the "KSA matrix") that was part of the 991 form.[11] *See id.* Three

---

11. Towler indicated that the KSA matrix reflected the requirements for the Manager of In–Plant Support position at Monmouth which included the ability to:

(1) manage the implementation of national and area processing and distribution programs and policies.

candidates, including Iadimarco, received a "superior" KSA matrix rating. *See id.*

Towler interviewed Iadimarco for the Monmouth position in March 1993.[12] *See id.* Iadimarco claimed that Towler told him he would be selected for the position pending approval of Henry Pankey ("Pankey"), a Black male and Towler's supervisor. *See id.* On 25 March 1993, and again on 1 April 1993, Towler requested permission to re-post the Monmouth position because the other two top candidates for the Monmouth position had taken other positions and Towler did not want to promote Iadimarco by "default." *See id.* Iadimarco argued that Towler re-posted the position because Towler was having difficulty obtaining approval from Pankey for Iadimarco to take the Monmouth position. *See id.* Iadimarco noted that Pankey wanted to hire a minority applicant for the Monmouth position to diversify the work place. *See id.* at 154–155. This assertion was based upon a memorandum that Pankey issued to all plant managers and installation heads in December of 1992 (the "Diversity Memo"). *See id.* at 155. The Diversity Memo stated:

> As we proceed to fill vacancies, I want to ensure that very serious consideration is given to the issue of diversity—I cannot emphasize this point more strongly. The management teams in our plants should reflect the composition of our workforce and communities if we are to benefit from the contributions that minorities, women, and ethnic groups can bring to our decision making processes and the social harmony that this will instill in our work environment.

(2) manage the review and evaluation of local operations.

(3) manage the development of local requirements for resources.

(4) resolve issues with customers, major mailers, and suppliers.

(5) provide technical support to post offices.

(6) manage the work of people to meet organization goals, including organizing

Your personal commitment is needed—if there are any questions on this matter, please feel free to contact me. *Id.* Pankey admitted signing this memo, but denied writing it. *See id.*

On or about 25 March 1993, Iadimarco and Towler discussed Iadimarco accepting the position of Operations Support Specialist (EAS 16) in the Monmouth facility. *See id.* In early March or April, Iadimarco accepted the position of Operations Support Specialist in the Trenton facility. *See id.* Some time after Iadimarco accepted the Trenton position, Toni Williams ("Williams"), a Black female, was promoted to Acting In–Plant Support Manager for the Monmouth facility. *See id.* Later it was formally announced that Williams had been promoted to In–Plant Support Manager of the Monmouth facility. *See id.*

Iadimarco initiated a proceeding before the Equal Employment Opportunity Commission ("EEOC") claiming he was denied the promotion because he was a White male. *See id.* The Administrative Law Judge who reviewed the complaint agreed, but the EEOC rejected these findings. *See id.* The EEOC concluded Iadimarco failed to establish a prima facie case of discrimination. *See id.* Iadimarco then filed a suit in Federal court alleging illegal racial discrimination under Title VII of the 1964 Civil Rights Act. *See id.*

The District Court granted summary judgment in favor of the Postal Service, finding that Iadimarco had not established a prima facie case of illegal discrimination. *See id.* In the alternative, the court granted summary judgment because Iadimarco had not rebutted the defendant's race-neu-

and structuring the work, establishing effective work relationships, and facilitating the flow of work-related information. *Iadimarco,* 190 F.3d at 154 n. 1 (citing the District Court Opinion).

**12.** This fact was contested by Towler before the District Court. *See Iadimarco,* 190 F.3d at 154.

tral explanation for the challenged employment decision. *See id.*

The Circuit reversed the grant of summary judgment; it found Iadimarco had made out a prima facie case of reverse discrimination and that genuine issues of material fact remained concerning whether the proffered reason was a pretext for discrimination. *See id.* at 166. In reviewing the evidence of discrimination, the Circuit explained that Towler's decision to hire Williams, a Black female, who had not received or even requested a KSA matrix rating, instead of Iadimarco, who had received a superior KSA matrix rating, was suspicious. *See id.* at 164. In addition, the Circuit commented that the application tendered by Williams was late and that she lacked an engineering degree, which Iadimarco alleged was a prerequisite for the In-plant Manager position. *See id.* Further, the Circuit commented that Iadimarco, having previously served as an In-Plant Manager in Trenton, had experience which Williams lacked. *See id.* The Circuit found that inferences drawn from the Diversity Memo cast doubt on the proffered reason for hiring Williams. *See id.* The Circuit commented that the failure to produce the Diversity Memo might create credibility issues concerning the authorship of the document. *See id.* The Circuit also pointed to inconsistencies in Towler's testimony about whether he interviewed Iadimarco In-plant Manager position which a reasonable fact finder could find significant. *See id.* Finally the Circuit noted:

> [A]n employer can not successfully defend a hiring decision against a Title VII challenge merely by asserting that the responsible hiring official selected the man or woman who was "the right person for the job." The problematic nature of such an explanation is most easily seen in the context of discrimination against a minority or female applicant. Such an applicant may never be the "right person for the job" in the eyes of one who feels that the job can only be filled by a White male. The biased decision maker may sincerely believe that the White male who was offered the job was the right person, and minority and female candidates who were rejected were simply wrong for the job. The mere fact that one who discriminates harbors a sincere belief that he hired the "right person" can not masquerade as a race-neutral explanation for a challenged hiring decision. Such a belief, without more, is not a race-neutral explanation at all, and allowing it to suffice to rebut a prima facie case of discriminatory animus is tantamount to a judicial repeal of the very protections Congress intended under Title VII.

*Id.* at 166–167. The Circuit explained that Towler's belief that Williams was "right for the job" without more did not amount to an adequate race-neutral explanation for rejecting Iadimarco. *See id.* at 167.

Unlike *Iadimarco,* the facts in the instant case do not raise any suspicion that age discrimination motivated the termination of Pepe. Testimony of both Bittner and Witter reflects that all employees of the Kitchen Sales Organization were evaluated and considered for the East Regional Sales Manager position, including Pepe and Pruner. *See* Bittner Dep. at 120; Witter Dep. at 37. Further, unlike Williams and Iadimarco, Pruner and Pepe had similar experience, both having served as District Sales Managers. Indeed, nothing in the record suggests that Pepe's qualifications were superior. Pepe acknowledged he had no knowledge of Pruner's qualifications or his performance as a District Sales Manager. *See* Pepe Dep. at 166. Further, while the plaintiff in *Iadimarco* pointed to the Diversity Memo as independent evidence of discriminatory intent, Pepe has not produced or pointed to evidence which even hints that Rival harbored a discriminatory animus toward older workers in general or him in particular. Finally, Pepe has not pointed out any inconsistencies in the evidence from Rival

which a reasonable factfinder could find significant.

 Assuming Pepe could make out a prima facie case of age discrimination under *Showalter* and *Iadimarco,* he cannot overcome Rival's legitimate, nondiscriminatory reason for offering the position to Pruner.

As discussed, to avoid summary judgment, Pepe must present competent evidence that "meaningfully throw[s] into question" the reasons proffered by Rival for selecting Pruner as the East Regional Sales Manager. *Fuentes,* 32 F.3d at 765. In the alternative, Pepe could have provided evidence "from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause" of Rival's employment decision. *Id.* Pepe has failed, however, to produce or point to any such evidence. Further, Pepe has not offered or pointed to any evidence which suggests Rival "treated him less favorably than others" or "illegally discriminated against" him because of his age. *Iadimarco* 190 F.3d at 161, 165.

To establish evidence that "meaningfully throw[s] into question" the reasons proffered by Rival for selecting Pruner, Pepe must show that the reasons were so implausible, inconsistent and incoherent that they were "unworthy of credence." *Iadimarco,* 190 F.3d at 166, *Fuentes,* 32 F.3d at 765. To establish evidence "from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause", *Id.,* of Rival's employment decision, Pepe must present evidence to demonstrate that Rival had previously "subjected him to unlawful discriminatory treatment." *Fuentes,* 32 F.3d at 765.

Unlike the plaintiffs in *Showalter* and *Iadimarco,* Pepe did not point to any evidence which supports his claim that the hiring of Pruner was a pretext for discrimination. Indeed, Showalter pointed to the inconsistencies between the testimony given by Treece and Eror on whether UPMC had a fixed policy concerning the type of seniority considered when making an RIF decision which evinced a genuine material factual dispute about whether the reason given for Showalter's termination was pretextual. Similarly, Iadimarco established that Williams applied after the deadline, had not filled out a 991 form or received a KSA matrix rating. Further, Iadimarco indicated that Williams did not have an engineering degree, which was a prerequisite for the In–Plant Manager position Iadimarco also established that he had previously been an In–Plant Manager while Williams had not. In addition, in *Iadimarco* Towler admitted to signing the Diversity Memo from which the Circuit inferred a discriminatory bias. Finally, Iadimarco pointed to inconsistencies which the Circuit believed a factfinder might consider significant.

In contrast, Pepe offers *no evidence* of discrimination. The record indicates Pepe and Pruner held comparable positions before the Reorganization. A comparison of Pruner and Pepe by members of Rival senior management revealed Pepe was the weaker candidate. Further, Pepe has not produced or pointed to any evidence of bias on the part of Bittner, Witter or any member of Rival senior management. Indeed, Pepe raises only the subjective argument that his experience and qualifications made him a better candidate for the East Regional Sales Manager position than Pruner. *See* Opposition Brief at 29; Pepe Dep. at 166, 392. As previously mentioned, this is not an issue in the case.

The instant case is also distinguishable from the facts in *Iadimarco* because unlike Towler's explanation that he believed Williams was the "right person" for the In-plant Manager position, Rival offered specific evidence to support Bittner's decision to hire Pruner. Although, Bittner noted he thought Pruner was the best candidate for the East Territory, Bittner backed up his choice with an explanation of the qualifications considered for the Regional Sales

Manager position. Indeed, the distinctions between the District Sales Manager position and the Regional Sales Manager position clearly support the criteria Bittner indicated he employed in making the decision to place Pruner in the East Regional Sales Manager position. Further, Rival produced evidence of Pepe's deficiencies in several of the areas which Bittner considered when filling the Regional Sales Manager positions. For example, several senior members of management, including Manning, Francis and Biggs, criticized Pepe's administrative and communication skills.

In addition, Pepe also has not established that Rival had previously "subjected him to unlawful discriminatory treatment," *Fuentes,* 32 F.3d at 765, or that Rival treated other, similarly situated persons who were sufficiently younger more favorably. *Showalter,* 190 F.3d at 237. While "the inquiry is not whether [Rival] discriminated [based upon age] in general but whether [it] illegally discriminated against [Pepe]," *Iadimarco,* 190 F.3d at 165, Pepe has not pointed to a single example of Rival treating him differently based upon his age. Indeed, Pepe acknowledged that no one at Rival ever made a comment about age. In addition, Pepe has not explained the statistical evidence presented by Rival, which indicates the average age of personnel in the Kitchen Sales Organization *increased* following the Reorganization. *See* Butler Cert. ¶ 2; *see also* Defendant's Rule 56.1 Statement ¶ 12. Nor does Pepe explain, if age discrimination was the motivating factor, why Lapenta, then age 35, was terminated while Curlett, then age 57, was retained. *See* Butler Cert. ¶ 2. Accordingly, Pepe cannot survive summary judgment. *See Showalter,* 190 F.3d at 237.

Due to the absence of any evidence indicating that the Regional Sales Manager did indeed replace the District Sales Manager, or, in the alternative, that Pruner was retained while Pepe was terminated based upon improper age considerations

the Motion for Summary Judgment is granted on the termination and replacement claim in favor of Rival.

### 2. *Failure to Promote Claim*

As previously stated, to prevent summary judgment on his failure to promote claim, Pepe must demonstrate: (1) he is a member of a protected class, (2) he applied and was qualified for a position for which the employer was seeking applicants, (3) he was rejected despite adequate qualifications, and (4) after his rejection the position was awarded to someone with equivalent or lesser qualifications who was sufficiently younger to create an inference of age discrimination. *See Bergen Commercial Bank,* 157 N.J. at 210, 723 A.2d 944; *Erickson,* 117 N.J. at 550, 569 A.2d 793; *Mogull,* 319 N.J.Super. at 64, 724 A.2d 863 (App.Div.1999); *Greenberg,* 310 N.J.Super. at 198, 708 A.2d 460; *see also Healy,* 860 F.2d at 1214; *Keller,* 130 F.3d at 1114 n. 5; *Lawrence,* 98 F.3d at 65; *Waldron,* 56 F.3d at 494; *Sempier,* 45 F.3d at 728; *MCI,* 829 F.Supp. at 1449.

Rival acknowledges Pepe has established he is a member of a protected class and that the position at issue was filled by Pruner, a candidate sufficiently younger than Pepe to create an inference of age discrimination. *See* Moving Brief at 11. Rival argues, however, that Pepe cannot make out a prima facie case on a failure to promote claim because he never applied for the Regional Sales Manager position. *See* Moving Brief at 20 n.4; *see also Bermingham v. Sony Corp. of America, Inc.,* 820 F.Supp. 834, 854–55 (D.N.J.1992), *aff'd without op'n,* 37 F.3d 1485 (3d Cir.1994).

Generally, Rival is correct that Pepe would have to apply for the position in order to establish a prima facie failure to promote claim. *See Bermingham,* 820 F.Supp. at 854–55. Rival did not, however, seek applications for the new Regional Sales Manager positions. In fact, neither Pepe nor any of the other District Sales Managers applied for, or were even aware of, the new positions prior to implementa-

tion of the Reorganization. *See, e.g.,* Pruner Dep. at 118. Because Rival did not give Pepe the opportunity to apply for the position, Rival may not now use this fact to deprive Pepe of his failure to promote claim.

 Assuming Pepe can make out a prima facie case of discrimination based upon a failure to promote, Rival has offered a legitimate, non-discriminatory reason for its decision not to place Pepe in the East Regional Sales Manager position— Rival believed Pruner was the best candidate among those candidates considered. *See* Moving Brief at 5; *see also* Manning Dep. at 33–34. As stated, to survive summary judgment. Pepe must now either "present sufficient evidence to meaningfully throw into question" the reason proffered by Rival for selecting Pruner as the East Regional Sales Manager or "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause" of Rival's decision not to appoint Pepe the East Regional Sales Manager. *Fuentes,* 32 F.3d at 765.

Rival contends Pepe was not the best qualified person for the East Regional Sales Manager position. *See* Moving Brief at 4–5. In fact, various members of Rival management criticized Pepe concerning his administrative and communication skills. *See* Witter Dep. at 38–42, 159–167, 169 (describing Pepe as "difficult to reach" and responding to calls not in "a punctual manner."); Biggs Dep. at 75–86; Francis Dep. at 9–12, 47–54 (noting she spoke with Bittner concerning various problems with the New York Territory advertising).

Further, one area in which Pepe excelled, customer contact, was significantly less important in the new Regional Sales Manager position. *See* Defendant's Rule 56.1 Statement ¶ 48. In fact, customer visits are now primarily handled by two sales representative agencies, the Militti Group and Synergy Sales. *See id.;* Bittner Dep. at 174; Manning Dep. at 107.

Pepe argues that his experience and qualifications indicate Rival should have appointed him to the East Regional Sales Manager position. *See* Opposition Brief at 29. Specifically, Pepe contends the criticism concerning his advertising administration represented a departure from previously accepted practices at Rival. *See* Pepe Cert. ¶¶ 21, 24. Pepe argues his continued receipt of the maximum advertising bonus and comments by his previous supervisor, Zehner, demonstrate his skill in advertising administration. *See* Opposition Brief at 2; *see also* Pepe Cert. ¶ 25; Zehner Dep. at 30. Further, Pepe asserts that he was consistently under budget and received compliments concerning his advertising administration. *See* Opposition Brief at 2–3; Pepe Cert. ¶ 25. Pepe admitted, however, he does not know the criteria Bittner used in making decisions concerning the Reorganization. *See* Pepe Dep. at 491, 507–508.

As stated, the average age of personnel in the Kitchen Sales Organization increased following the Reorganization. *See* Butler Cert. ¶ 2; *see also* Defendant's Rule 56.1 Statement ¶ 12. Lapenta, then age 35, was terminated. Curlett, then age 57, for example, was appointed to a Regional Sales Manager position. *See* Butler Cert. ¶ 2.

Pepe has not demonstrated the determination Pruner was the best candidate for the position was merely a pretext for age discrimination. Indeed, Pepe does not directly challenge the evidence proffered by Rival concerning the qualifications of Pruner. *See, e.g.,* Pepe Dep. at 166. Pepe admits he has no knowledge of Pruner's qualifications or his performance as a District Sales Manager. *See id.* Further, Pepe admits he has no knowledge of what Bittner considered when selecting the East Regional Sales Manager or even what Bittner believed the qualifications of the Regional Sales Manager position were. *See* Pepe Dep. at 31, 34–35, 151–152, 168, 491, 507–508.

In response to the assertion that Pruner was the best candidate for the East Regional Sales Manager position, Pepe argues his experience and seniority made him more qualified for the position. *See* Opposition Brief at 34–35; Pepe Dep. at 166, 392.

Pepe has not offered or pointed to any evidence to support a charge that he was the target of illegal age discrimination. Indeed, he has not explained the statistical evidence presented by Rival, which indicates the average age of personnel in the Kitchen Sales Organization increased following the Reorganization. *See* Butler Cert.¶ 2; *see also* Defendant's Rule 56.1 Statement ¶ 12. Moreover, Pepe has not explained, if age discrimination was a motivating factor for his non-selection, why Lapenta, then age 35, was terminated while Curlett, then age 57, was retained. *See* Butler Cert. ¶ 2. The "central focus of the inquiry [in an age discrimination claim] is always whether an employer is treating some people less favorably that others because of" age. *Iadimarco*, 190 F.3d at 160. However, Pepe offers nothing to suggest either Manning or Bittner treated him less favorably, much more, sought to terminate him because of his age.

Pepe argues Bittner considered terminating Curlett as part of the Reorganization. *See* Opposition Brief at 28. Bittner stated his rational behind considering the elimination of Curlett stemmed from a decrease in sales in the territory Curlett supervised. *See* Bittner Dep. at 136–138. Bittner reconsidered his evaluation of Curlett based upon a conversation with Manning. *See id.; see also* Yager Dep. at 16–17, 23–24, 33; Manning Dep. at 33. Manning told Bittner that Curlett should not be terminated because he was doing a good job for Rival. *See* Bittner Dep. at 136; *see also* Manning Dep. at 34. However, Pepe offers nothing to suggest either Manning or Bittner sought to terminate him because of his age.

Pepe also argues the scheme "to expose" him, initiated by Witter and Royal–Ferris, tainted the decisions Bittner made concerning the East Regional Sales Manager position. *See* Opposition Brief at 25–27. However, he has neither offered nor pointed to any evidence or inference to support this argument. Pepe relies heavily on *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir.1990). *See* Opposition Brief at 26–27 (describing *Shager* as "indistinguishable" from the present case).

In *Shager*, the Seventh Circuit reversed the grant of summary judgment on an age discrimination claim. *See Shager*, 913 F.2d at 407. The plaintiff in *Shager* was employed as a Wisconsin sales representative by a manufacturer of seeds which was bought by Asgrow Seed Company ("Asgrow") in 1983. *See id.* at 399. The plaintiff, Ralph Shager ("Shager") then fifty years old, reported to John Lehnst ("Lehnst"), Asgrow's youngest district manager, then thirty-five years old. *See id.* Shortly after the acquisition, Asgrow hired a second sales representative, Eugene Stouffer ("Stouffer"), then forty-eight, to help Shager with his territory. *See id.* Lehnst divided the Wisconsin territory into two parts a northern and a southern territory, rejecting Shager's suggestion that it be divided along an east/west line. *See id.* The northern section was more challenging because it was larger and the farmland was of a poorer quality, producing a lower demand for seeds. *See id.* Lehnst assigned the northern part to Shager and the southern to Stouffer.

Two years later, Lehnst hired Lane Schradle ("Schradle"), then twenty-nine years old, to be a third Wisconsin sales representative, despite anticipating the territory could not support three sales representatives. *See id.* Schradle had no previous experience in the seed business. *See id.*

Lehnst redivided the Wisconsin territories, keeping Shager in the inferior northern part. *See id.* Stouffer was given the southeastern part of the state, and Schradle the southwestern part plus several

counties in northern Illinois. *See id.* at 400. The territory assigned to Schradle was the richest from a seed marketing standpoint; Shager's remained the poorest. *See id.* The sales results reflected Shager performed better than Schradle, but Lehnst misrepresented Shager's performance to the "Career Path Committee" and recommended Shager be fired. *See id.* After Shager was fired, the state was divided between Schradle and Stouffer along an east/west, as Shager had previously suggested. *See id.*

In *Shager*, the record reflected various age-related remarks made by Lehnst. *See id.* For example, in one conversation Lehnst stated: "These older people don't much like or much care for us baby boomers, but there isn't much they can do about it." *See id.* Periodically, Lehnst was also heard to say "the old guys know how to get around things." *See id.* Further, despite poor sales performance, Lehnst wrote of Schradle in his first performance evaluation: "It is refreshing to work with a young man with such a wonderful outlook on life and on his job". *See id.*

The *Shager* court explained summary judgment was inappropriate because, affording Shager all reasonable inferences, a case of discrimination had been made out. *See id.* at 401–402. By manipulating the Wisconsin territory, Lehnst attempted to alter Shager's performance. *See id.* When Shager still outsold Schradle, Lehnst misrepresented the sales figures to the Career Path Committee and urged firing Shager. *See id.* Further, the age-related comments made by Lehnst and the redistricting of the Wisconsin territory indicated the termination of Shager could have been motivated by age bias and not poor performance. *See id.* It was concluded Shager established a prima facie case of employment discrimination and cast sufficient doubt on the employer's proffered reasons for his termination to survive summary judgment. *See id.* at 401 ("If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may rationally be drawn").

Pepe's reliance on *Shager* is misplaced. In *Shager*, the plaintiff produced direct evidence—at least three examples—of hostility to older workers on the part of his supervisor. *See id.* In the instant case, Pepe has acknowledged no one at Rival, including Witter, ever made such a comment. *See* Pepe Dep. at 29–31. Further, in *Shager* the sales reports provided documentary evidence of the superior sales performance of the plaintiff. *See Shager*, 913 F.2d at 401–402. In the present case, Pepe admits he has no knowledge of Pruner's qualifications or his performance as a District Sales Manager. *See* Pepe Dep. at 166. Further, in *Shager*, the plaintiff offered evidence that Lehnst gave preferential treatment to other sales representatives, while Pepe has offered only opinion evidence that the New York Territory was difficult. Indeed, Pepe's allegation that Witter and Royal–Ferris set out to make him fail is unsupported. Given the differences in the evidence presented, *Shager* offers Pepe no support.

Pepe has failed to come forward with any evidence to establish either that (1) the proffered reasons for hiring Pruner instead of Pepe are not credible or (2) discrimination was more likely than not a motivating or determinative cause of the decision to terminate Pepe. In fact, the only evidence offered by Pepe are his own conclusory statements regarding his and Pruner's qualifications. *See* Pepe Dep. at 165. These are insufficient to defeat summary judgment. *See Johnson*, 949 F.Supp. at 1173–74 (because plaintiff's experience and skills were not necessary to the position sought no pretext was established); *see also Ridgewood Bd. of Ed.*, 172 F.3d at 252 (speculation and conclusory allegations are insufficient to forestall summary judgment); *Sterling Nat'l Mortgage Co.*, 97 F.3d at 44 (conclusory allegations are not sufficient to survive summary judgment); *Swarts v. Sherwin–Williams Co.*, 244 N.J.Super. 170, 178, 581 A.2d 1328

(App.Div.1990)(a plaintiff cannot evade summary judgment "by raising a misguided subjective belief, without more, to create the existence of a genuine issue of material fact."). Accordingly, the Motion for Summary Judgment is granted on the failure to promote claim.

### C. *Breach of Employment Contract*

Pepe alleges provisions of the Rival Associate Handbook created an implied employment contract. *See* Complaint, Second Count, ¶ 3. Pepe also alleges Rival is liable for breach of either an express and/or implied employment contract based upon his membership in the Secular Trust and the asserted verbal promises concerning the Secular Trust. *See* Complaint, Second Count, ¶ 4. The Complaint alleges:

It is Defendant's company policy as stated in Defendant's Associate Rival Associate Handbook that positions will be filled wherever possible by transfer or promotion of the best qualified individual from within the company. Defendant appointed an employee who was less qualified, less senior and less experienced than Plaintiff to the position of Regional Sales Manager in violation of company policy.

In addition to the above, Plaintiff had an express or implied contract of employment to retirement age based upon representations made to him and his membership in the "Secular Trust" retirement plan

Complaint, Second Count ¶¶ 2, 3. Pepe admits that he never signed a formal employment contract with Rival. *See* Pepe Dep. at 191.

Pepe contends New Jersey law should be applied to all of his contract claims. *See* Opposition Brief at 30. Rival disagrees, asserting Missouri law should govern. *See* Moving Brief at 26.

■ In a diversity action, a Federal court is obliged to, apply the substantive law of the state in which the forum is located, including the applicable choice of law principles. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), *cert. denied,* 316 U.S. 685, 62 S.Ct. 1284, 86 L.Ed. 1757 (1942); *Robeson Indus. Corp. v. Hartford Accident & Indemnity Co.*, 178 F.3d 160, 164 (3d Cir.1999); *National Utility Service, Inc. v. Chesapeake Corp.*, 45 F.Supp.2d 438, 446 (D.N.J.1999).

■ Under New Jersey law, the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties. *See Pfizer v. Employers Insurance of Wausau*, 154 N.J. 187, 192–193, 712 A.2d 634 (1998); *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 134 N.J. 96, 102–103, 629 A.2d 885 (1993); *Keil v. National Westminster Bank, Inc.*, 311 N.J.Super. 473, 485, 710 A.2d 563 (App.Div.1998). To determine which jurisdiction has the more significant relationship and closer contacts with the parties and the contract, New Jersey courts follow the non-exclusive list enumerated in the Restatement (Second) of Conflict of Laws § 188:

(a) the place of contracting;

(b) the place of negotiation of the contract;

(c) the place of performance;

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188(2) (1969); *see, e.q., Keil,* 311 N.J.Super. at 485, 710 A.2d 563. In addition, New Jersey courts consider the factors discussed in Restatement (Second) of Conflict of Laws § 6:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1969); *General Ceramics Inc. v. Firemen's Fund Insurance Cos.*, 66 F.3d 647, 653 (3d Cir.1995).

■■■ The record does not indicate where the alleged contract of employment was negotiated or formed. Rival is incorporated in Delaware with its principal place of business in Missouri. *See* Notice of Removal ¶ 4. Pepe is a resident of New Jersey. *See* Complaint; Notice of Removal at ¶ 3. The alleged contract of employment is based, in part, on the Rival Associate Handbook, which was mailed from Rival in Missouri to Pepe in New Jersey. *See* Pepe Cert. ¶ 45. Further, Pepe performed substantial aspects of his job in the State of New Jersey. *See* Pepe Cert. ¶ 2 ("I was given the responsibility of selling Rival's products in Rival's New York territory, which included parts of New York, New Jersey and parts of New England."). Finally, Pepe was terminated in New Jersey. *See* Complaint, First Count at ¶ 8; Plaintiff's Rule 56.1 Statement at ¶¶ 61–62; Pepe Cert. ¶ 60.

Based upon the above relevant contacts, New Jersey appears to have a stronger interest in the contract of employment based upon the Rival Associate Handbook than Missouri. *See Keil*, 311 N.J.Super. at 486, 710 A.2d 563. Specifically, much of Pepe's employment duties and responsibilities were performed in New Jersey. *See* Pepe Cert. ¶ 2. Concerns regarding certainty, predictability and uniformity of result, particularly with regard to construction of the terms in the Rival Associate Handbook, weigh in favor of applying Missouri law because Rival employees in different states could sue and achieve different results under the same Rival Associate

Handbook provisions. *See Pfizer*, 154 N.J. at 207–208, 712 A.2d 634. However, because the Rival Associate Handbook did not contain a choice-of-law provision, Rival must have expected the law of the jurisdiction where liability occurred would control. *See id.* at 203, 712 A.2d 634 (failing to include a choice-of-law provision implies the parties assumed the place where liability was incurred would control). Accordingly, the application of New Jersey law is appropriate concerning the alleged employment contract based upon the Rival Associate Handbook. *See id.*

■■■ Pepe also alleges the Secular Trust Agreement created a contract of employment which he contends assured his position with Rival until retirement. *See* Opposition Brief at 37; *see also* Pepe Dep. at 307 (based on a conversation with Mr. Endres Pepe believed he had a job with Rival until 65). The Secular Trust Agreement upon which Pepe relies to establish his employment contract claim, contains a choice-of-law provision. *See* Secular Trust Agreement at 22. The choice-of-law provision entitled "Governing Law" states: "To the extent not preempted by the Employee Retirement Income Security Act, this Trust Agreement and the Trusts created herein shall be construed, regulated and administered under the laws of the State of Missouri."

New Jersey courts tend to enforce choice-of-law provisions in contracts provided the public policies of New Jersey are not offended and the contract bears some relation to the chosen jurisdiction. *See Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341, 614 A.2d 124 (1992); *Bell v. Merchants & Businessmen's Mut. Ins. Co.*, 241 N.J.Super. 557, 562, 575 A.2d 878 (App.Div.1990), *certif. denied*, 122 N.J. 395, 585 A.2d 395 (1990); *see also Alcman Services Corp. v. Bullock, P.C.*, 925 F.Supp. 252, 259 (D.N.J. 1996), *aff'd without op'n*, 124 F.3d 185 (3d Cir.1997); *Green Constr. Co. v. First Indem. of America Ins. Co.*, 735 F.Supp.

1254, 1259 n. 2 (D.N.J.1990), *aff'd without op'n*, 935 F.2d 1281 (3d Cir.1991); *Security Sav. Bank v. Green Tree Acceptance, Inc.*, 703 F.Supp. 350, 354 (D.N.J.1989) ("New Jersey conflict of laws principles clearly recognize the validity and enforceability of choice-of-law provisions in contracts....").

The Secular Trust Agreement expressly provides that it is governed by Missouri law. *See* Secular Trust Agreement at 22. Because New Jersey enforces choice-of-law provisions that are not offensive to New Jersey public policy, the claim based upon the Secular Trust Agreement will be governed by Missouri law. *See Security Sav. Bank*, 703 F.Supp. at 354.

1. *Existence of an Employment Contract*

a. *Contract Based upon the Rival Associate Handbook*

Pepe alleges Rival breached his implied employment contract when the company (1) violated the Promotions and Transfers section of the Rival Associate Handbook by appointing Pruner, an allegedly less qualified candidate, to the Regional Sales Manager position instead of him and (2) failed to follow the Corrective Action Procedures listed in the Rival Associate Handbook before terminating him. *See* Opposition Brief at 32. As previously discussed, New Jersey law will be applied to this contract claim.

The New Jersey Supreme Court discussed the prevailing "at-will" employment rule in *Savarese v. Pyrene Mfg. Co.*, 9 N.J. 595, 89 A.2d 237 (1952). *Savarese* established:

[I]n the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge

without cause does not constitute a breach of contract justifying recovery of money damages therefor.

*Id.* at 600–01, 89 A.2d 237 (citations and quotations omitted). In *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 544 A.2d 377 (1988), the New Jersey Supreme Court reaffirmed *Savarese*, explaining proof of lifetime employment must be " 'clearly and unequivocally expressed in the contract itself.' " *Id.* at 285, 544 A.2d 377 (quoting *Savarese*, 9 N.J. at 603, 89 A.2d 237); *Obendorfer v. The Gitano Group, Inc.*, 838 F.Supp. 950, 953 (D.N.J. 1993) (quoting *Savarese*, 9 N.J. at 600–01, 89 A.2d 237); *see also Fregara v. Jet Aviation Business Jets*, 764 F.Supp. 940, 945 (D.N.J.1991) (commenting on the improbability of an employer agreeing to a contract where only the employee may terminate the relationship).

In *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985), *modified on other grounds* 101 N.J. 10, 499 A.2d 515 (1985), the New Jersey Supreme Court distinguished implied contract claims based on employment manuals from the long term contracts disfavored by the at-will employment rule. *Id.* at 285–86, 491 A.2d 1257. The New Jersey Supreme Court explained that claims based on an employment manual will not be held to the same exacting standard as more general claims of lifetime employment. *See id.* at 295, 491 A.2d 1257. Indeed, it was recognized that an implied contract based upon provisions in a company employment manual "could be found to be contractually enforceable." 99 N.J. at 297, 491 A.2d 1257.

When an employer circulates a manual to its employees discussing company policy, the terms should be construed "in accordance with the reasonable expectations of the employees." *Id.* at 297–98, 491 A.2d 1257 (quoting *Savarese*, 9 N.J. at 601, 89 A.2d 237). If commitments were made in the distributed manual "an employer should be required to honor [them]." *Id.* at 297; *see also Nicosia v.*

*Wakefern Food Corp.*, 136 N.J. 401, 411, 643 A.2d 554 (1994) (noting an employee need not even be aware of a policy to be protected by it).

 A company may prevent its employment manual from creating an implied employment contract by including a "clear and prominent disclaimer." *Woolley*, 99 N.J. at 285, 491 A.2d 1257; *see also Nicosia*, 136 N.J. at 411, 643 A.2d 554. The purpose of an effective disclaimer is to put an employee on notice "that she or he is employed only at will and subject to termination without cause." *Nicosia*, 136 N.J. at 412, 643 A.2d 554. As the *Woolley* court remarked:

> [A]bsent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will.

99 N.J. at 285–86, 491 A.2d 1257.

 To determine the adequacy of a disclaimer, New Jersey courts consider the clarity and prominence of the disclaimer. *Nicosia*, 136 N.J. at 413, 643 A.2d 554 (citing *Woolley*, 99 N.J. at 309, 491 A.2d 1257); *see also Sellitto v. Litton Systems, Inc.*, 881 F.Supp. 932, 938 (D.N.J.1994). The clarity requirement addresses whether the disclaimer indicates the manual was not intended to create a binding obligation. *See Nicosia*, 136 N.J. at 413, 643 A.2d 554 (citing *Woolley*, 99 N.J. at 309, 491 A.2d 1257). The prominence requirement addresses the placement of the disclaimer in the manual and likelihood an employee's attention would be drawn to the disclaimer. *See id.*

 To meet the clarity requirement the disclaimer language must be "such that no one could reasonably have thought [the manual] was intended to create legally binding obligations." *Woolley*, 99 N.J. at 299, 491 A.2d 1257. The clarity requirement "compels analysis of the language

and content of a disclaimer." *Sellitto*, 881 F.Supp. at 933. The language must "indicate in, straightforward terms that the employee is subject to discharge at will." *Preston v. Claridge Hotel & Casino, Ltd.*, 231 N.J.Super. 81, 85, 555 A.2d 12 (App. Div.1989); *see also Nicosia*, 136 N.J. at 412, 643 A.2d 554. Provisions containing "confusing legalese" will not pass the clarity requirement. *Nicosia*, 136 N.J. at 413–14, 643 A.2d 554; *Woolley*, 99 N.J. at 300, 491 A.2d 1257; *Preston*, 231 N.J.Super. at 85, 555 A.2d 12; *see also Sellitto*, 881 F.Supp. at 933.

 To establish the prominence requirement, the disclaimer must "be separated from or set off in a way to attract attention." *Nicosia*, 136 N.J. at 415, 643 A.2d 554. The prominence requirement "compels consideration of the physical characteristics of a disclaimer, such as its typeface, heading and the degree to which its placement attracts attention." *Sellitto*, 881 F.Supp. at 933; *see also Nicosia*, 136 N.J. at 415, 643 A.2d 554 ("prominence can be satisfied in a variety of settings and, no single distinctive feature is essential per se to make a disclaimer conspicuous").

 When there are no disputes regarding the language and placement of a disclaimer, the adequacy of a disclaimer is a question of law. *See Nicosia*, 136 N.J. at 416, 643 A.2d 554; *see also Sellitto*, 881 F.Supp. at 933.

The protections offered by *Woolley* based upon employment manuals are not absolute, however. *See Woolley*, 99 N.J. at 301, 491 A.2d 1257 n.8; *Linn v. Beneficial Commercial Corp.*, 226 N.J.Super. 74, 79, 543 A.2d 954 (App.Div.1988); *see also Brunner v. Abex Corp.*, 661 F.Supp. 1351, 1355 n. 3 (D.N.J.1986). Employees are safeguarded only from arbitrary termination. *See Woolley*, 99 N.J. at 301 n. 8, 491 A.2d 1257; *Linn*, 226 N.J.Super. at 79, 543 A.2d 954; *see also Brunner*, 661 F.Supp. at 1355 n. 3. In cases involving business reorganizations, *Woolley* does not bar "an employer from eliminating posi-

tions and terminating employment of a worker in furtherance of a legitimate business objective." *See Linn*, 226 N.J.Super. 74, 79, 543 A.2d 954 (App.Div.1988) (citing *Woolley*, 99 N.J. at 301 n. 8, 491 A.2d 1257); *see also Brunner*, 661 F.Supp. at 1355 n. 3 ("It is hard to conceive that the Supreme Court of New Jersey intended to prevent a company from cutting its work force due to economic factors.") (citing *Woolley*, 99 N.J. at 301 n. 8, 491 A.2d 1257).

 In the instant case, the Rival Associate Handbook itself contains a disclaimer titled ASSOCIATE HANDBOOK STATEMENT, which provides:

> This Rival Associate Handbook is by no means intended to cover every facet of the Associate–Employer relationship. Regardless of the manner or duration of the Associate's compensation, NOTHING CONTAINED HEREIN SHALL CREATE EMPLOYMENT FOR A DEFINITE TERM and the statements made herein are simply general statements of THE RIVAL COMPANY ("THE COMPANY") policy. Without prior notice and at any time for any reason, the Company specifically reserves the right to:
>
> 1. MODIFY THESE POLICIES,
>
> 2. APPLY THEM IN A MANNER THAT RETAINS DISCRETION IN THE COMPANY, OR
>
> 3. REFRAIN FROM APPLYING THESE POLICIES
>
> ASSOCIATES MAY TERMINATE THEIR EMPLOYMENT WITHOUT PRIOR NOTICE AT ANY TIME FOR ANY REASON, THE COMPANY MAY DO THE SAME. All oral statements made at any time regarding employment and any written employment rules, statements, policies or Rival Associate Handbooks of any form or nature issued prior to this manual are hereby revoked. The Company's policies may not be changed except in writing by the President of The Company.

Rival Associate Handbook at 2 (emphasis added). The emphasized language satisfies the clarity requirement because it plainly says "nothing contained herein shall create employment for a definite term" and because it expressly reserves the right to terminate employees without notice and for any reason. As well, it avoids the use of specialize legal terms. *See Nicosia*, 136 N.J. at 413–14, 643 A.2d 554; *Woolley*, 99 N.J. at 300, 491 A.2d 1257;. *Preston*, 231 N.J.Super. at 85, 555 A.2d 12; *but see Sellitto*, 881 F.Supp. at 939–940 (holding that similar language avoided "specialized legal terms" but failed the clarity prong because it did not reference the employment the handbook or manual upon which plaintiff based his implied contract claim).

The disclaimer satisfies the prominence requirement because the heading "ASSOCIATE HANDBOOK STATEMENT" reflects its application to the entire Rival Associate Handbook. *See Sellitto*, 881 F.Supp. at 939. In addition, the rights to modify, exercise discretion in or refrain from applying policies expressed in the Rival Associate Handbook are capitalized and set off in the disclaimer text. *See Nicosia*, 136 N.J. at 415, 643 A.2d 554. While Pepe testified that he did not read the disclaimer because nothing about the page "made it seem any more important than the first few pages" this does not prevent the disclaimer from binding him. See *Nicosia*, 136 N.J. at 411, 643 A.2d 554 ("An employee may not select the provisions of a [sic] employment manual to determine which provision should give rise to enforceable contractual obligations").

Pepe argues that although the Rival Associate Handbook contained a disclaimer, it nonetheless created an implied employment contract under *Woolley*. *See* Opposition Brief at 32. Pepe relies upon *Sellitto v. Litton Systems, Inc.*, 881 F.Supp. 932 (D.N.J.1994) to establish the disclaimer in the Rival Associate Handbook was not sufficient to negate an implied employment

contract. *See* Opposition Brief at 33 [13] (arguing *Sellitto* "is indistinguishable" from the present case).

In *Sellitto*, the plaintiff sued alleging an implied employment contract based upon an employment manual and an employment handbook. *See Sellitto*, 881 F.Supp. at 938. In response to the suit, defendants claimed any implied employment contract was disclaimed by (1) Airtron's initial employment letter to the plaintiff, (2) a paper signed by the plaintiff acknowledging receipt of an employment booklet, (3) a paper signed by the plaintiff acknowledging receipt of the employment handbook, (4) the prefaces to the employment manual and the employment handbook (the "Preface Disclaimers"), (5) text within the employment manual and the employment handbook regarding job security (the "Text Disclaimers") and (6) the statement the plaintiff signed on his first day at work ("Statement Disclaimer"). *See Sellitto*, 881 F.Supp. at 938.

The court dismissed the arguments concerning the employment letter and the statement acknowledging receipt of the booklet because they both failed to reference the employment handbook and manual upon which plaintiff relied to form an implied employment contract. *See id.* Similarly, the court dismissed the statement acknowledging receipt of the employment handbook because it did not contain disclaimer language. *See id.*

Next the court considered the Preface Disclaimers, which appeared as single-paragraph statements alone on a page at the beginning of the employment handbook and employment manual respectively. The preface to the employment handbook stated:

**13.** Plaintiff implies in the Opposition Brief that *Sellitto* is controlling. *See* Opposition Brief at 33. Because *Sellitto* is a District Court decision, it is not binding on this court. Unlike the Supreme Court or the Courts of Appeal, the district court does not speak with

### PREFACE

Neither this handbook nor any statement set forth in it shall constitute a contract of employment, or be construed or interpreted as such. In the event of any alleged conflict between this provision and any other part of this handbook, this provision shall prevail.

*Id.* The preface to the employment manual was similar:

### PREFACE

The policies and procedures set forth in this manual are for the guidance of management and supervision. Nothing set forth in these policies and procedures constitutes a contract for employment nor shall any part of them be construed or interpreted in any way to constitute a contract of employment.

*Id.* at 939. The *Sellitto* court found the Preface Disclaimers were not sufficiently clear to negate the detailed job security provisions contained in the employment handbook and manual. *See id.* The court observed that in order negate a detailed, comprehensive job security provision such as the one found in the employment manual, *Woolley* and *Nicosia* required a disclaimer

> be cast in language that conveys to non-lawyers that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have absolute power to fire anyone with or without good cause.

*Id.* citing (*Woolley*, 99 N.J. at 309, 491 A.2d 1257). Further, the Sellitto court

one voice and thus decisions by individual district courts cannot be treated as binding precedent on other district judges within the same. *See Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir.1991); *In re Raphael*, 238 B.R. 69, 74 (D.N.J.1999).

noted the Preface Disclaimers contained legal terms an employee would "not be expected to understand." *Id.* (citing *Nicosia,* 136 N.J. at 414, 643 A.2d 554). As such, it found the Preface Disclaimers did not prevent the plaintiff from asserting an implied employment contract. *See Sellitto,* 881 F.Supp. at 938.

Next the *Sellitto* court considered the disclaimers located on the third page of the employment handbook and the fourth page of a manual discussing job security, appearing under the boldfaced heading "NOTE." *See id.* It was held that the disclaimers were not sufficiently prominent because they were not " 'separated from or set off in a way to attract attention.' " *Id.* (quoting *Nicosia,* 136 N.J. at 415, 643 A.2d 554). Specifically, it was observed that the "bland heading 'NOTE' is particularly inconspicuous." *Id.*

Finally, the court considered the statement the plaintiff in *Sellitto* signed on his first day of work was titled "SUBJECT: STATEMENT OF EMPLOYMENT RELATIONSHIP." *See id.* at 939. The statement read:

> Congratulations on your first day at Airtron–Litton Systems. While we are pleased with your decision to begin employment with our Company, we are also aware that a satisfactory employment relationship exists only with the mutual agreement of both employee and Company. As previously stated in our employment application, *the Company recognizes your right to resign at any time for any reason, and retains the right to terminate the employment relationship at any time for any reason.*

*Id.* (emphasis added). It was held that the statement was "sufficiently prominent, as it [was] set off in a conspicuous manner, with a heading that reflects its content." *Id.* (citing *Nicosia,* 136 N.J. at 415, 643 A.2d 554). The court also found the language sufficiently clear because it avoided

legalistic language, but refused to apply the statement to the employment manual and employment handbook because the statement did not reference them or job security specifically. *See id.* at 939.

The instant case is distinguishable from the *Sellitto* case. While in *Sellitto* the defendants relied upon eight disclaimers, here Rival relies upon a single disclaimer, the Associate Handbook Statement. The Associate Handbook Statement, unlike the Text Disclaimers in *Sellitto,* clearly indicated by its title that it concerned the Rival Associate Handbook. Also, unlike the Preface Disclaimers in *Sellitto,* the language of the disclaimer in the Associate Handbook Statement is clear and simple. The Rival Associate Handbook states: "nothing contained herein shall create employment for a definite term." In addition, unlike the Preface Disclaimers, the Associate Handbook Statement expressly reserved the right to terminate employment for any reason at any time.

The disclaimer at issue satisfies both the clarity and the prominence requirements; Pepe cannot rely upon the Rival Associate Handbook to establish an implied employment contract. See *Nicosia,* 136 N.J. at 413, 643 A.2d 554; *Woolley,* 99 N.J. at 309, 491 A.2d 1257; *see also Sellitto,* 881 F.Supp. at 938. Further, even if Pepe could rely upon the Rival Associate Handbook to create an implied employment contract, he cannot establish Rival breached that contract by failing to follow the Corrective Action Procedures.

■ The parties agree Pepe was not terminated for cause.[14] *See* Moving Brief at 11.; Opposition Brief at 23. Pepe was terminated in the course of a business reorganization. *See* Moving Brief at 11.; Opposition Brief at 23. *Woolley* permits employers bound by implied employment contracts based upon assurances of job security to make business-related decisions

---

**14.** Termination "for cause" means the firing was premised on poor performance or a failure in the execution of an employee's duties.

*See Picogna v. Board of Education of the Township of Cherry Hill,* 143 N.J. 391, 393, 671 A.2d 1035 (1996).

regarding the elimination of positions. *See Woolley,* 99 N.J. at 301 n. 8, 491 A.2d 1257; *Linn,* 226 N.J.Super. at 79, 543 A.2d 954. As such, Pepe cannot establish Rival breached an implied employment contract to terminate only for cause. *See Linn,* 226 N.J.Super. at 79, 543 A.2d 954.

Even assuming Pepe could establish an implied employment contract based upon the Rival Associate Handbook, Rival substantially complied with the procedures set forth in the Promotions and Transfers section of the Rival Associate Handbook. Although Rival did not interview for the Regional Sales Manager positions, Pepe was not placed at a disadvantage by this procedure. Bittner considered all the District Sales Managers for the Regional Sales Manager positions. *See* Bittner Dep. at 120, 137. Further, consistent with Rival's policy of filing "vacancies wherever possible by transfer or promotions", Rival Associate Handbook at 17, the Regional Sales Manager positions were filled with members of the Kitchen Sales Organization. *See* Bittner Dep. at 164–165, 174–175. Indeed, the testimony of Bittner and Witter reflects that Bittner considered "ability, experience, overall job performance and attendance", Rival Associate Handbook at 17, in placing members of the Kitchen Sales Organization in the new Regional Sales Manager positions. *See* Bittner Dep. at 120; Witter Dep. at 37–39.

Bittner testified he decided not to offer a Regional Sales Manager position to Pepe. *See* Bittner Dep. at 136. In making this decisions, Bittner relied, in part, upon Witter's evaluation of the District Sales Managers. *See id.* at 96. Witter testified his evaluations represented his "perception of the sales job" done by each of the District Sales Managers. *See* Witter Dep. 37. Witter ranked Pepe "as the weakest member of the sales team," because Pepe was difficult to reach by phone and lacked computer training. *See id.* Further, Witter asserted Pepe did not respond punctually to e-mails, was unprepared for a sales presentation, did not adequately focus on, and even ignored, various accounts in the New York territory, did not know how to get to an account on Long Island and administration of the advertising budget. *See id.* at 38–39.

Bittner acted in conformity with the Promotions and Transfers section of the Rival Associate Handbook because the evaluation of Pepe reflects his "overall job performance." Rival Associate Handbook at 17. With the exception of not interviewing any candidates for the new positions, which as mentioned above did not place Pepe at a disadvantage, Pepe has not offered or pointed to any evidence which establishes that Rival did not act in substantial conformance with the dictates of the Promotions and Transfers section of the Rival Associate Handbook. Because Rival substantially complied with the procedures listed in the Promotions and Transfers section of the Rival Associate Handbook, Pepe has not established a claim for violations of the implied employment contract.

Accordingly, the Motion for Summary Judgment is granted as to the contract claims based upon the Rival Associate Handbook.

### b. *Contract Based Upon the Secular Trust Agreement*

Pepe argues the Secular Trust Agreement created either an express and/or implied contract of employment which guaranteed his position with Rival until retirement. *See* Opposition Brief at 37; *see also* Pepe Dep. at 307 (based on a conversation with Endres, Pepe believed he had a job with Rival until 65).

The parties do not dispute that the Secular Trust Agreement is a valid contract. *See* Plaintiff's Rule 56.1 Statement ¶ 73; Objections and Admissions to Plaintiff's Rule 56.1 Statement ¶ 73. The parties disagree only about whether the Secular Trust Agreement establishes an employment contract. *See* Moving Brief at 27; Opposition Brief at 37.

Pepe argues the Secular Trust Agreement created an employment contract. *See* Opposition Brief at 37–38. Pepe cites no portion of the Secular Trust Agreement as the basis for his assertion that the plan created an employment contract. *See id.;* Plaintiff's Rule 56.1 Statement ¶ 73; Pepe Cert. ¶¶ 55–57. Further, Pepe admitted he did not even read the Secular Trust Agreement until after his termination. *See* Pepe Dep. at 185–186, 189–190.

Pepe admitted no one from Rival ever told him participation in Secular Trust guaranteed employment until retirement. *See id.* at 306.[15] In fact, Pepe knew at least one member of the Secular Trust, Endres, who had been fired. *See id.* at 190. Finally, Pepe conceded that no one would believe inclusion in the Secular Trust would ensure lifetime employment under all circumstances. *See id.* at 307.[16]

 When interpreting a contract, the Missouri courts first look to the language of the agreement to ascertain the intention of the parties. *See Peters v. Employers Mut. Cas. Co.,* 853 S.W.2d 300, 302 (Mo.1993) (en banc); *see also State Farm Mutual Automobile Ins. Co. v. Shahan,* 141 F.3d 819, 823 (8th Cir.1998) (interpreting Missouri law). Provided the terms are clear and unambiguous, Missouri courts will give the words of the contract effect. *See Peters,* 853 S.W.2d at 302; *see also Trinidad Corp. v. National Maritime Union of America, District No. 4, Marine Engineers Beneficial Ass'n,* 81 F.3d 769 (8th Cir.1996) *reh'g denied,* (1996) (interpreting Missouri law).

 The terms of a contract must be read as a whole to arrive at the inten-

tion of the parties. *See Columbia Mut. Ins. Co. v. Schauf,* 967 S.W.2d 74, 77 (Mo. 1998) (en banc); *Jos. A. Bank Clothiers, Inc. v. Brodsky,* 950 S.W.2d 297, 303 (Mo. Ct.App.1997) (citing *Village of Cairo v. Bodine Contracting Co.,* 685 S.W.2d 253, 264 (Mo.Ct.App.1985)). An " 'interpretation of a contract that creates unreasonable results, when a more probable and reasonable construction can be adopted, will be rejected.' " *Dwyer v. Unit Power, Inc.,* 965 S.W.2d 301, 307 (Mo.Ct.App.E.D. 1998) (citing *CB Commercial Real Estate Group, Inc. v. Equity Partnerships Corp.,* 917 S.W.2d 641, 647 (Mo.Ct.App.W.D. 1996)); *see also DeJong v. Sioux Center,* 168 F.3d 1115, 1120 (8th Cir.1999).

 Under Missouri law, employment tendered in the absence of a contract which provides either a term of employment or limits the reasons an employee may be discharged is considered "at-will" employment. *See Luethans v. Washington University,* 894 S.W.2d 169, 172 (Mo. 1995); *Porter v. Reardon Machine Co.,* 962 S.W.2d 932, 936–37 (Mo.Ct.App.1998); *Faust v. Ryder Commercial Leasing & Services,* 954 S.W.2d 383, 389 (Mo.Ct.App. 1997); *see also Paul v. Farmland Industries,* 37 F.3d 1274, 1277 (8th Cir.1994), *cert. denied* 514 U.S. 1017, 115 S.Ct. 1360, 131 L.Ed.2d 217 (1995); *Jones v. Becker Group, of O'Fallon Division,* 38 F.Supp.2d 793, 796 (E.D.Mo.1999). At will employees may be discharged from employment without cause or reason. *See Luethans v. Washington University,* 894 S.W.2d 169, 172 (Mo.1995); *Porter v. Reardon Machine Co.,* 962 S.W.2d 932, 936–37 (Mo.Ct. App.1998); *Faust v. Ryder Commercial Leasing & Services,* 954 S.W.2d 383, 389

---

15. The relevant testimony read:

Q. ...Did anyone ever tell you that participation in this plan guaranteed you employment until retirement age?
MR. COHEN: In those words?
MR. GARDINER: In those words.
A. In those specific words?
Q. Yes.
A. No.
Pepe Dep. at 306.

16. Pepe stated in his deposition:

Well, I don't think anybody, anyone would think under all circumstances. I would think if I continued to perform my duties as I've been in the past and planned on continuing to do in the future and continued to get good job reviews and perform as I was performing, then I would be there [at Rival] until 65.
*Id.* at 307.

(Mo.Ct.App.1997). The Missouri Supreme Court has indicated a statement of duration is "an essential element to an employment contract." *Luethans,* 894 S.W.2d at 172.

Based upon the strong presumption of at will employment, Missouri courts generally do not recognize implied employment contracts. *See, e.g., Johnson v. McDonnell Douglas Corp.,* 745 S.W.2d 661, 662 (Mo.1988) (noting the unilateral distribution of employment manuals is not sufficient to create a valid contract as there is no offer, acceptance or bargained for consideration); *West Central Missouri Regional v. Board of Police Commissioners of Kansas City, Missouri,* 939 S.W.2d 565, 568 (Mo.Ct.App.1997) (holding the "unilateral act of publishing [a] manual was not a contractual offer"). For example, in *Paul v. Farmland Industries,* 37 F.3d 1274 (8th Cir.1994), the Circuit, applying Missouri law, held a management incentive plan could not alter the at will status of the plaintiff. *See id.* at 1276.

▬ Based upon the unambiguous language of the Secular Trust Agreement and reading it as a whole, it is clear that the document does not provide any guarantees concerning employment tenure at Rival. *See L & K Realty Co.,* 633 S.W.2d at 278. For example, the Secular Trust Agreement defined a "terminated participant" as any person "who has been a Participant, but *whose employment has been terminated other than by death." See* Secular Trust Agreement at 8 (emphasis added). Further, the Secular Trust Agreement provided for the determination of benefits when a participant terminates his or her participation for reasons other than death. *See id.* The Secular Trust Agreement also indicated distribution of benefits would occur

in no event later than the 60th day after the close of the Plan Year in which the latest of the following events occurs: (a) the date on which the Participant attains the earlier age of 65 *or* the Normal Retirement Age specified herein; (b) the 10th anniversary of the year the Participant commenced participation in the Plan; or (c) the date the Participant terminates his or her service with the Company.

*Id.* at 13.

Interpreting the Secular Trust Agreement as an employment contract would create the unreasonable result of transforming pension plan participants, included in the Secular Trust solely based upon their income level, into employees with tenure at Rival. By virtue of their inclusion in the Secular Trust, highly compensated employees of Rival would receive, without offering any additional consideration, greater job security. The more reasonable interpretation of the Secular Trust Agreement is that it is a pension plan. *See Dwyer,* 965 S.W.2d at 307.

Pepe has not offered any evidence that he has a written contract for employment. Accordingly, concerning his Secular Trust argument, Pepe is deemed an employee at will under Missouri law. *See Luethans,* 894 S.W.2d at 172; *Porter,* 962 S.W.2d at 936–37; *Faust,* 954 S.W.2d at 389; *see also Farmland Indus.,* 37 F.3d at 1277; *Becker Group, of O'Fallon Division,* 38 F.Supp.2d at 796. As an employee at will Pepe could be discharged "for no reason or for an arbitrary or irrational reason." *Shawcross v. Pyro Prods., Inc.,* 916 S.W.2d 342, 343 (Mo.Ct.App.1995) (quotations omitted).

Pepe argues in the absence of an express contract his inclusion in the Secular Trust created an implied employment contract because he allegedly was told it was an "opportunity for enhanced retirement" and to "be secure in [his] retirement age." Pepe Dep. at 307, Pepe Cert. at ¶ 56. Missouri law does not recognize implied employment contracts. *See Johnson,* 745 S.W.2d at 662; *West Central Missouri Regional,* 939 S.W.2d at 568; *see also Farmland Indus.,* 37 F.3d at 1276.

As a matter of law, neither the language of the Secular Trust Agreement itself nor the alleged conversations concerning the

Secular Trust results in an employment contract as asserted by Pepe. Accordingly, the Motion for Summary Judgment is granted as to the express and/or implied contract claims based upon the Secular Trust Agreement.

### D. *Covenant of Good Faith and Fair Dealing*

Pepe alleges Rival breached the covenants of good faith and fair dealing in the implied employment contract created by the Rival Associate Handbook. *See* Opposition Brief at 39. Specifically, Pepe contends Witter and Royal–Ferris acted in bad faith by (1) terminating Frain in order to expose him rather than counseling him as the Rival Associate Handbook requires and (2) "creating a false perception that he was not properly performing his job." *Id.* Pepe has offered no evidence to support these claims.[17]

■ The covenant of good faith and fair dealing is implicit in all contracts. *See Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 421, 690 A.2d 575 (1997) (it is the law "in New Jersey that each party to a contract must deal fairly and in good faith with the other in their performance under the contract...."); *see also Polito v. Continental Casualty Co.*, 689 F.2d 457, 463 (1982) (noting New Jersey contract law implies into every contract the duty to deal fairly and in good faith). The doctrine of good faith and fair dealing cannot, however, create rights or obligations in the absence of a valid contract. *See Scudder v. Media General, Inc.*, 1995 WL 495945, 1995 U.S.Dist.LEXIS 11817 at 15–16 (D.N.J.1995), *aff'd without op.*, 1996 U.S.App.LEXIS 15017 (3d Cir.1996) ("Where there is no contract between the parties, there is nothing into which the Court may imply a term of fair deal-

ing.... It is well settled that the implied term of fair dealing will not work to constrain an employer's discretion to terminate an at-will employee").

■ Under New Jersey law, an implied obligation of good faith attaches to those aspects of an at will employment relationship which are governed by some contractual terms. *See DeJoy v. Comcast Cable Communications, Inc.*, 968 F.Supp. 963, 989 (D.N.J.1997) (citing *Peck v. Imedia, Inc.*, 293 N.J.Super. 151, 168, 679 A.2d 745 (App.Div.), *certif. denied*, 147 N.J. 262, 686 A.2d 763 (1996)). The implied covenant of good faith and fair dealing will not, however, work to limit an employer's discretion in terminating at will employees. *See Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir.1996); *Obendorfer*, 838 F.Supp. at 954 (citing *Noye v. Hoffmann–La Roche, Inc.*, 238 N.J.Super. 430, 570 A.2d 12 (App.Div.), *certif. denied*, 122 N.J. 146, 584 A.2d 218 (1990)); *Brunner*, 661 F.Supp. at 1356; *accord Stinson v. Burns & McDonnell Engineering Co.*, 1988 WL 53375, 1988 U.S.Dist. LEXIS 17921 (W.D.Mo.1988).

■ Pepe relies upon the Rival Associate Handbook to support his implied covenant of good faith claims. *See* Opposition Brief at 39. Pepe argues the termination of Frain "to expose" him and the failure of Witter and Royal–Ferris to employ the Corrective Action Procedures are evidence of bad faith. *See id.* Further, Pepe argues Witter acted in bad faith by "creating a false perception that [Pepe] was not properly performing his job and then ranking him as the worst salesperson in the company based upon artificially contrived pressures." *Id.*

---

17. In light of the previous choice of law analysis the implied covenant of good faith and fair dealing is analyzed under New Jersey concerning the employment claims based upon the Rival Associate Handbook. Even if Missouri law governed the claim would fail because Missouri does not permit employees to circumvent the employee at will policy by alleging a covenant of good faith and fair dealing. *See, e.g., Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo.1996) (refusing to permit a claim for emotional distress because it would subvert Missouri's at will employment policy).

Pepe neither offers nor points to evidence, however, to support his argument that Rival acted in bad faith. Legitimate business reasons were articulated for terminating Frain. *See* Witter Dep. at 99. Further, the decision to make Pepe responsible for the New York Territory does not evince bad faith on the part of Witter or Royal–Ferris. *Id.* Finally, unlike *Shager*, no evidence has been offered to show Witter created a false perception that Pepe was not performing his job well. *See Shager*, 913 F.2d at 401.

In order to survive summary judgment on an implied covenant of good faith and fair dealing claim, a plaintiff must either (1) withstand summary judgment on his contract claim or (2) offer some evidence of bad faith in relation to a contractual term which governs his or her at will employment. *See DeJoy*, 968 F.Supp. at 989. The contract claims brought by Pepe have all failed as a matter of law. Further, Pepe has offered no more than conclusory statements or arguments to support his allegations of bad faith. Accordingly, his breach of the implied covenants of good faith and fair dealing claim must also fail. *See Scudder*, 1995 WL 494945, 1995 U.S.Dist.LEXIS 11817 at 15–16. The Summary Judgment Motion is granted as to the implied covenant of good faith and fair dealing claim.

*Conclusion*

For the reasons stated, the Motion for Summary Judgment is granted.